(82 App. Div. 1.)

WHITE et al. v. COLLINS BLDG. & CONST. CO.

(Supreme Court, Appellate Division, First Department. April 9, 1903.)

1. DEEDS — CONSTRUCTION — BUILDING RESTRICTIONS — "TENEMENT HOUSE" — APARTMENT HOUSES.

At the execution of a deed in 1873 to property in controversy, containing a covenant in favor of adjoining property that no "tenement house" should be erected on the property, such houses were understood to mean houses containing suites of rooms renting from $6 to $15 per month, by persons of very limited means, and at that time apartment houses as the same have been subsequently constructed were unknown. *Held*, that such restriction did not prevent the construction of a modern apartment house of a commodious and handsome appearance, fitted with various suites of rooms to be occupied by tenants, each suite complete in itself, and equipped with modern appliances and conveniences, renting from $600 to $1,100 per year.

2. SAME—TENEMENT HOUSE.

The definition of a "tenement house" contained in 2 Laws 1867, p. 2273, c. 908, § 17, providing for the regulation of tenement and lodging houses in the cities of New York and Brooklyn, is restricted to the provisions of that act, and does not control the definition to be applied to such term in construing a covenant in a deed that no tenement house should be erected on the property.

Submission of controversy between Frederick W. White and another and the Collins Building & Construction Company. Judgment for plaintiffs.

Argued before VAN BRUNT, P. J., and HATCH, PATTERSON, O'BRIEN, and INGRAHAM, JJ.

Abram I. Elkus, for plaintiffs.
Morris H. Hayman, for respondent.

INGRAHAM, J. The plaintiffs entered into a contract with the defendant whereby the plaintiffs, in consideration of $87,500, purchased from the defendant, and the defendant agreed to convey to the plaintiffs, certain property in the city of New York upon the payment of $87,500. The objection to the title is based upon a covenant in a deed by which the premises in question were conveyed to the plaintiffs' predecessor in title by the executors of Jacob Harsen in the year 1873. That covenant is as follows:

"That the said party of the second part, for himself, his heirs and assigns, doth hereby covenant to and with the said parties of the first part, their successors and assigns, and with the owners for the time being of the adjacent lots, jointly and severally, that neither the said party of the second part, nor his heirs nor assigns, shall or will at any time hereafter erect any buildings within forty feet of the front of said premises, except of brick or stone, with roofs of slate or metal, and will not erect or permit upon any part of said premises any stable of any kind, * * * railroad depot, rail-

road stable, car, engine or tenement house or any other trade, manufactory, business or calling which may be in any way dangerous, noxious or offensive to the neighboring inhabitants, and that no building shall be erected upon said lands, or any of them, which shall contain any alley or entrance running through them for ingress or egress to rear buildings, and it is declared that this covenant is a lien and runs with said lands, and binds the persons seized thereof for the time being."

It is stated in the submission that in the agreement of August 12, 1902, by which the defendant agreed to purchase the property, it was expressly stated that the defendant "intends to build and erect upon the premises sought to be conveyed an apartment house to be occupied by a number of families"; and the question that the parties submit to this court is: "Does the covenant against nuisances contained in the deed of Jacob Halstead, James N. Platt, and John H. Rhoades, surviving executors of the last will and testament of Jacob Harsen, M. D., deceased, to Emil Oelbermann, dated June 10, 1873, prohibit the construction of a high-grade, modern apartment house?" And the parties stipulate that:

"If the court determines that the defendant's proposed apartment house does not come within the letter and spirit of the definition of 'tenement house,' as set forth in section 17, c. 908, p. 2273, of the Laws of 1867, vol. 2, then judgment should be entered for the plaintiffs. (2) That if the court determines that the restriction covenant of 1873 is inoperative as respects the plaintiffs' vacant lots herein described, then judgment should be entered for the plaintiffs. (3) If the court determines that the title to the aforesaid vacant lots is good and marketable for the building upon them of an apartment house to be used as such, then judgment should be entered for the plaintiffs."

In considering this covenant we are to ascertain the intention of the parties to the conveyances of which the covenant is a part, and give it due effect. Particular words in such a covenant are to be given the meaning that was commonly given to them at the time the instrument containing the covenant was executed. In ascertaining the intention of the parties, the whole instrument must be considered, and, when the various uses of the property which were prohibited are considered, it becomes apparent that what was intended was to prevent the use of the premises in any way that would be a nuisance to the adjoining property. A great number of uses are prohibited, all of them of a kind that produce disagreeable odors or noises, or attract to the neighborhood large crowds or undesirable persons. Thus there is prohibited any stable, slaughter house, meat shop, tallow chandlery, manufactory of glass, which would tend to produce disagreeable odors, and make the neighborhood undesirable for residence; and steam engine, smithshop, forge, furnace, brass foundry, which tend to create smoke and noises; drinking or lager beer establishments, circus, menagerie, or public show, which tend to attract to the neighborhood people that are not desirable in a residential locality. "Tenement house" is bracketed with a railroad depot, railroad stable, or car house, and it would seem that the intention was to prohibit those uses which would tend to injure the general character of the neighborhood, and make it inappropriate for the residence of refined and prosperous people. It is common knowledge that in the year 1873 and prior to that time modern apartment houses were unknown in the city of New York, and the parties in their statement of

facts stipulate that "an apartment house, as such, was unknown in 1873; the word 'apartment house' only came into use about 1880"; that "an apartment house is a building used as a dwelling house for several families, each family living separate and apart from the others; that the building is commodious, and is very handsome in outward and inward appearance, and fitted with every modern appliance for the comfort of tenants; that each separate family uses the main hall for an entrance to the building; each suite of rooms is a dwelling house, with a separate hall, water-closet, bath, and in itself complete in every detail"; and that the defendant "proposes to erect and build upon the premises in question an apartment house which shall be in all respects of the highest class. It is to be built and equipped to comply with all modern demands for the comfort and convenience of the tenants, and to comply with law. It is to be used exclusively for residential and family purposes. That the building will be six stories in height. Its exterior will be brick and stone of the best quality. That the entrances to the building from the street will be of marble. Chairs, desks, and paintings are to be placed in these main entrances. That there will be five to seven suites of rooms on each of the six floors. On each floor there are to be apartments of five rooms and bath, six rooms and bath, and seven rooms and bath. In each suite of rooms there will be a hall, parlor, dining room, bedrooms, kitchen, servants' room, a tiled bath and water-closet. * * * That each separate apartment will have a private hallway, a dumb-waiter, wardrobes, mirrors, separate washstands, separate toilet, awnings, hot and cold water, and gas ranges. * * * That the rental values of these apartments will be graded according to the location of the apartment; the lowest rental to be about $600 a year, the highest about $1,100 a year." The parties have also stipulated as to what was known in the year 1873 as a "tenement house," and this description is substantially different from that of an apartment house as defined.' It is stipulated that suites in a tenement house rented from $6 a month to $15 a month, according to the number of rooms, and were rented by people of very limited means.

Comparing this statement of the definition of a tenement house, as existing in 1873, with the definition of an apartment house when that term came into common use, and the description of the building that the defendant intends to erect; considering the object for which this covenant was intended, and the nature of the various uses that were prohibited—it must be apparent that the building that the defendant proposes to erect is not a tenement house within the meaning of the covenant, and was not in the contemplation of the parties when the instrument containing the covenant was executed. An apartment house, the erection of which is contemplated by the defendant, would clearly not be a use of the property which would be dangerous, noxious, or offensive to the neighboring inhabitants. What was clearly contemplated was that a tenement house, as then known and in use in the city of New York, should not be erected upon the property. The erection of a hotel was not prohibited, nor was the use of the property restricted to dwelling houses so constructed that one dwelling should be under each roof. The restriction was confined to

one particular residential use, viz., a tenement house. The fact that hotels, boarding houses, or houses of that character, which were then common in New York, were not prohibited, would seem to show that the parties did not intend to restrict the premises to residences of a particular kind. What was contemplated was that the building of a tenement house, as then understood in New York, should not be allowed. But the modern apartment house is a building entirely distinct from what was then understood as a tenement house. To designate a modern apartment house as a tenement house would be a misuse of the word, as it would be to call the building that the defendant intends to erect a tenement house. Such a building is not now, and never has been, known by such a name in common use, and to extend this covenant beyond what was clearly intended at the time, so as to exclude a use which was at that time unknown in New York, but which since has become common in this portion of the city, and which does not tend to produce any of the evils that it was clearly the intention of the parties to the instrument to guard against, would be to import into the covenant a provision that was never contemplated, and extend it much beyond what the parties actually intended.

It is a familiar principle in the construction of covenants of this kind, as was said by the presiding justice in Clark v. Jammes, 87 Hun, 215, 33 N. Y. Supp. 1020, that "in the construction of restrictive covenants of this kind it must be borne in mind that they are to be construed most strictly against the covenant"; and by Justice Hatch in Sonn v. Heilberg, 38 App. Div. 515, 56 N. Y. Supp. 341: "That is, the covenant, being in derogation of the right of the unrestricted use of the land for all lawful purposes, shall not be incumbered by any restrictive clause unless the same be plainly within the intent of the parties as gathered from the language used in the covenant and from surrounding circumstances." Applying this test, it seems to me quite clear that neither of the parties intended to prevent the use of the property for what is now called an apartment house.

It is insisted, however, that the definition of a tenement house contained in chapter 908, p. 2273, Laws of 1867, which was in force at the time this instrument was executed, as any house which is erected, leased, or hired to be kept or occupied as a home or residence for more than three families, living independent of one another, and doing their cooking upon the premises, must be applied to this covenant. This definition of a tenement house, however, is expressly restricted to that particular act. Provision was there made for the regulation of tenement and lodging houses in the cities of New York and Brooklyn, and that statute was passed at a time when, according to the submission, apartment houses and houses of the character that the defendant intends to build were unknown in New York. It regulated the construction of sleeping rooms, provided for proper ventilation, for fire escapes, proper roofs, drainage, and proper water-closets and plumbing, and contained stringent provisions for the removal of garbage and filth from the houses and yards, and for proper inspection by the public authorities. The nature of the

buildings to which these provisions were to apply was designated in the act as tenement houses, and a tenement house, for the purposes of that act, was given a general definition, which would include·the houses of that kind then commonly constructed. It may be that an apartment house would be required to comply with the provisions of this statute so long as it was in force, but the object of the definition was merely to indicate the nature of the building to which the statute was applicable; not to make all buildings that would come within the definition tenement houses for all purposes and for all time to come. What we have to determine here is whether an apartment house of the character designed by the defendant was a tenement house within the meaning of the parties to this instrument in 1873, and it seems to me clearly that it was not.

·We think that the erection of a building as contemplated by the defendant is not a tenement house, within the meaning of the restrictive clause contained in this conveyance, and that under the submission the plaintiffs are entitled to judgment. As the submission requests that no costs should be granted to either party as against the other, no costs are awarded. All concur, except VAN BRUNT, P. J., who dissents.