## Wytheville

## KATHRYN E. ELTERICH AND C. FRED ELTERICH *v.* THE LEICHT REAL ESTATE COMPANY, INC.

### June 16, 1921.

1. BUILDING RESTRICTIONS—*Apartment House—Two-Family House—Case at Bar.*—A deed of a lot by a real estate improvement company engaged in developing a residential section, provided that no apartment house should be erected upon the property conveyed. Deeds to other lots in the same section contained the same restriction.

   *Held:* That "apartment house," as thus used, included a two-family dwelling-house, two stories in addition to basement, divided into two apartments, one on the first floor above the basement and the other on the second floor, both apartments consisting of a kitchen, dining room, living room, bath room, water closet and three bed rooms, together with a hall, pantry, and certain closets, although the house had but one outside front door and one outside back door.

2. DEEDS—*Construction—Construed Most Strongly Against Grantor.*—A deed is construed most strongly against the grantor and in favor of the grantee. This rule has been called one of the most just and sound principles of the law because the grantor selects his own language. If therefore, the deed can inure in different ways, the grantee, it is said, may take it in such way as will be most to his advantage. This rule, however, has no application where, in the light of the surrounding circumstances, the meaning of the language of the deed is plain. *Quod id certum est, quod certum reddi potest.*

3. COVENANTS—*Construction—Parol Evidence—Surrounding Circumstances.*—When a word or phrase used in a covenant has more than one meaning, judicial knowledge of existing circumstances and conditions is indispensable to a correct exposition of the law upon the subject, and to that end parol evidence is admissible.

4. COVENANTS—*Construction—Surrounding Circumstances.*—Regard must be had to the object which a covenant was designed to

accomplish, and the language used is to be read in an ordinary or popular, and not in a legal and technical, sense.

5.  BUILDING RESTRICTIONS—*Construction.*—The language used in a building restriction must be given its obvious meaning and be construed in accordance with the intention of the parties, assuming that the restriction was put into the deed not simply for the benefit of the grantor, but for the benefit of every property owner in the neighborhood. The words in such a covenant are to be given the meaning that was commonly given to them at the time the instrument containing the covenant was executed, and the intention of the parties is to be gathered from their words by reading, not simply a single clause of the agreement, but the entire context, and by considering the surrounding circumstances.

6.  BUILDING RESTRICTIONS—*Apartment House—Two-Family House—Case at Bar.*—There was evidence in the instant case that in accordance with the code of the National Board of Fire · Underwriters of New York and the building code of Norfolk city, a building is not defined as an apartment house unless it is constructed or used for the separate occupancy of more than two families or households. But there was no evidence tending to show that the parties in entering into the covenant forbidding the erection of an apartment house upon the lot in question contracted with reference to either of these codes, and there was evidence that according to the ordinary and popular understanding in the community at the time the deed was executed, a two-family apartment house would have been considered "an apartment house."

    *Held:* That a two-family house was within the covenant.

7.  BUILDING RESTRICTIONS—*Apartment House—Waiver—Case at Bar.*—In the instant case the evidence does not show that the objection to the building proposed to be erected by grantees in a deed, on the ground that it would be an apartment house prohibited by a covenant in the deed, was waived by the grantor.

Appeal from a decree of the Circuit Court of Norfolk county. Decree for complainant. Defendants appeal.

*Affirmed.*

This suit was instituted by the appellee against the appellants (who will be hereinafter designated plaintiff and defendants, respectively, in accordance with their positions in

29

the court below), having for its object the obtaining of a permanent injunction restraining the defendants from proceeding with the erection of a certain building alleged to be in violation of certain restrictions or conditions contained in the deed from plaintiff to one of the defendants, which conveyed to the latter the lot on which the building was being erected.

A preliminary injunction was granted on the filing of the bill; subsequently depositions were taken and filed in behalf both of plaintiff and defendants, and upon consideration of the cause on the merits the court below entered the decree under review, which granted the permanent injunction sought by the bill.

The material facts, the issues, and conflicts in the evidence are as follows:

The plaintiff is engaged in the business of developing a residential section known as Winona, located in Norfolk county, constituting one of the suburbs of Norfolk city. The plaintiff was chartered in 1909, acquired the ownership of the real estate in that section, subdivided it into lots, with streets and avenues, and undertook to build side-walks, macadamize the streets and avenues, lay gas and water mains, provide a drainage and sewerage system, etc., and sold the lots to purchasers with certain restrictions and conditions contained in all of the deeds to purchasers. The purchasers united in the deeds. These restrictions and conditions were the same as those contained in the deed to the defendant, Mrs. Kathryn E. Eletrich, presently to be more specifically mentioned, except that about five years before this suit, the words "apartment house" were added to the restrictions as contained in the sixth clause of the last named deed.

By deed dated February 5, 1919, in which the defendant, Mrs. Elterich, united as the party of the second part, the plaintiff conveyed to such defendant, the lot above men-

tioned, subject to certain conditions and restrictions set forth in the deed, a portion of which are as follows:

"First—The property hereby conveyed shall not, for a period of twenty-one years, be sold, rented or otherwise disposed of to persons of African descent.

"Second—No intoxicating liquor or ardent spirits shall be sold upon the property hereby conveyed.

"Third—No swine shall be kept upon the property hereby conveyed.

"Fourth—Wood posts may be used in constructing fences on and around said property, but otherwise no wood fences shall be erected or placed on or around the property hereby conveyed.

"Fifth—Not more than one house, out-building excepted, shall be erected or placed upon one lot designated on said plat, nor shall such house be erected or placed upon said property, except in conformity to the building line established by the said company, nor shall any house or any part thereof, except outside steps, be erected or placed within fifteen feet of the front of any lot shown on said plat.

"Sixth—No flat roofed or double house, storehouse, factory building or apartment house shall be erected or placed upon the property hereby conveyed, nor shall it be used for commercial or manufacturing purposes.

"Seventh—No residence shall be erected or placed upon the property hereby conveyed to cost less than four thousand ($4,000) dollars, and no house shall be erected or placed upon said property so as to throw the rear part thereof toward the side of any adjoining lot, and for a period of ten years from January first, 1910, all dwelling houses erected upon said property shall be built according to plans submitted to the directors of said company and approved by them.

"Eighth—No stable shall be placed or erected upon any of the lots shown on said plat without the consent in writing

of the said company as to the plans and location thereof; nor shall outbuildings be placed within seventy feet of the front of any lot shown on said plat, and no stable or outbuildings shall be erected or placed on any water front lot shown on said plat, except a garage, the plans and location of which shall be subject to approval of said company.

"Ninth—Live stock, owned or controlled by the said purchaser, shall not be permitted to roam beyond the boundary lines of such property as may be owned or controlled by said purchaser, nor shall such live stock be fastened to any trees upon the streets or avenues shown on said plat.

"Tenth—No use shall be made of the said property or any part thereof, which may constitute a nuisance or injure the value of any of the neighboring lots, and no sign boards shall be erected or placed upon said property, without the consent in writing of said company.

"Eleventh—All houses erected upon any lots shown on said plat shall, when required by the company, be connected by the owner thereof with such sewerage system as may be installed by the company, as herein provided.   * * *

"Eighteenth—The said company shall not be required to enforce said conditions, restrictions, rules and regulations except so far as it has lawful right to enforce the same.

"The above restrictions and conditions shall be inserted in all deeds of conveyance hereafter made by the said company. Except that required cost of house may be changed according to location.

"The said purchaser, in consideration of the premises, agrees and promises not to violate any of the aforesaid conditions, and it is hereby agreed that should the said purchaser violate the first of the above conditions, the said company shall, in addition to the remedies provided by law, have the right to re-enter for such breach of condition and be seized of its former estate, subject to the lien of any deed of trust created by said purchaser or . . . . successors to se-

cure a debt hereafter contracted, and in the event of the violation of any of the other of the aforesaid conditions, the said company shall, in addition to all remedies provided by law, have the right of re-entry and abatement without liability for damages."

The bill quotes the sixth and seventh clauses of the restrictions or conditions in the deed and alleges that the defendants had commenced the erection on said lot of a dwelling house according to certain plans, of which copies were filed with the bill, and that the erection of such home on such lot would be in violation of the sixth clause of said restrictions or conditions, in that such house would be a double-house or an apartment house.

The testimony both for plaintiff and defendants concurs in showing that the house which the defendants were proceeding to erect, and which they claim by answer filed in the case and by their proof that they have the right under their deed to erect, was a two story dwelling house, in addition to the basement, with but one outside front door and one outside back door, but both of such doors opened into front and rear vestibules, respectively, from which vestibules there were separate front and separate rear entrances into two separate apartments; one apartment, on the first floor above the basement, consisting of a kitchen, dining room, living room, bath room, water closet and three bed rooms, together with a hall, pantry, and certain closets; and the other apartment, on the second floor, being the exact duplicate of the first floor with respect to the same number and size of rooms, including a bath room, water closet, hall, pantry and closets; so as to be suitable for the separate occupancy of the building by two families, for living, cooking and eating therein; the front and rear entrances to the first named apartment being on the said first floor, and such entrances to the second named apartment being up front and rear stair-

ways extending from the front and rear vestibules aforesaid to the said second story of the house.

The primary question in issue between the parties plaintiff and defendant is whether such a house is an apartment house within the meaning of the sixth covenant aforesaid in the deed; it not being contended for the plaintiff that the proof shows that such a house is a double house.

At the time the deed was executed, the plaintiff had sold a considerable portion of the lots in Winona, on quite a number of which dwelling houses had been erected and were occupied. During the world war and up to the time of such deed some fifty per cent. of such houses were occupied by more than one family, although, with a single exception, presently to be mentioned, they were not constructed so that the respective families could occupy separate apartments; but this was considered an exceptional condition due to the scarcity of houses to accomodate the congested population in that section during that period. Even the president of the plaintiff company at that time rented to another family a portion of the residence in Winona in which he with his family lived during such period, and such renting was going on when defendants purchased said lot and the deed thereto was made. When such purchase and deed were made there was one, and, as aforesaid, but one dwelling house in Winona which was constructed for separate occupancy by two families. That was what is designated in the record as the "Neff" residence, which was a two-story house, constructed into two separate apartments, one on the first and the other on the second floor. All the other dwelling houses in Winona, including that of the president of the plaintiff company, were constructed for the separate occupation of only one family. Many of them, however, were large enough for the joint occupancy of more than one family.

It does not appear from the evidence at what time the deed from the plaintiff was made conveying the lot on which the one exceptional house just mentioned was located, nor whether such deed contained the restriction against an apartment house. It does appear from the testimony of the secretary of the plaintiff company that such house was erected about four and a half or five and a half years. before this suit was instituted, and that the secretary did not discover that that house had been constructed in that way until he moved to Winona, which was about a year and a half before such suit.

At the time the purchase by defendents and the deed to one of them were made, the defendants, as well as the plaintiff, were familiar with the character of construction of all of the dwelling houses which had been built in Winona.

As bearing on the question of whether the defendants and the plaintiff contracted, in the matter of the restrictions contained in the sixth clause thereof, with the contemplation that the defendants would build a dwelling house which would be large enough for the joint occupancy of more than one family, such as the dwelling house of the president of the plaintiff company and all the other large dwelling houses which had at that time been built in Winona, except the Neff house, but not for the separate occupancy of more than one family; or with the contemplation that they would build a dwelling house with two separate apartments, such as the Neff house, the defendant C. F. Elterich testified as follows, making reference to the time and to what occurred when the purchase of the lot by defendants was closed:

"The question was brought up as to what kind of a house we anticipated building, and we told them" (Mr. Leicht, the president, and Mr. Sherritt, the secretary of the plaintiff company) "that we anticipated building a house for ourselves and to make it a little large so in case we saw fit

we could give somebody else a home that would appreciate it * * * Mr. Leicht stated, 'if you are going to build that kind of a house, fix it so that it won't look like an apartment house.' I said, 'Mr. Leicht, I don't want it to look like an apartment house because this is my home.' He says, 'You will have one door in front and one door in the back?' I said, 'That is my idea exactly.' I said 'being familiar with the requirements of the Winona property, I want to strictly adhere to them.' He said, 'Well, if you put one door in the front and one door in the back and build you a nice house, we won't have anything to say about it.' "

Mrs. Elterich testified on the same subject as follows:

" * * Mr. Sherritt asked us what kind of a house we were going to build, * * and I told him * * that we were going to build a large house. He said, 'What do you mean by a large house?' I said, 'A house large enough that can be used by two families.' Mr. Leicht said, 'That is a very good idea, I am renting my house now at the present time and making enough out of it to pay interest on $6,000.00 and I think it a fine idea.' Mr. Sherritt said, 'Well, you remember that you are not to have but one entrance in the front.' I said, 'We thoroughly understand that. We understand what the restrictions are in Winona and it is just going to be a home, but we are going to have it made large enough so, if we wish to rent out part of it, we can,' and they both agreed it was a very good idea."

The defendants shortly thereafter had an architect make for them the plans above mentioned, and they let the contract for the building to be erected in accordance therewith.

Both the plaintiff and defendants introduced a number of architects and builders as witnesses in their behalf, respectively. All of them, in substance, concur in the statement that a building constructed in accordance with the plans aforesaid would be a two-family apartment house, although the witnesses for the defendants balk at the word

"apartment," and, for the most part, prefer to designate the house as a "two-family house."

The testimony for the plaintiff is to the effect that in the ordinary and popular understanding generally, and in Winona and also in Norfolk city, such a house as that mentioned in the last paragraph above is considered to be an "apartment house," sometimes designated a "two-family apartment house."

The testimony for the defendants is to the effect that in the United States at large many cities have adopted the building code recommended by the National Board of Fire Underwriters of New York, of which code section 9 gives the following definition of an apartment house, namely: "An apartment house shall be taken to mean and include every building which shall be intended or designed for, *or used as,* the home or residence of *three or more* families or households, living independently of each other," etc. (Italics supplied.)   That the building code of Norfolk city defines an apartment house as, "Any building or any portion thereof designed, *or used, as* a residence for *more than two* families or households living independently of each other and in which every such family or household shall have provided for it a separate bath room and water closet, separate and apart from each other."   (Italics supplied.) That irrespective of such codes "there is no generally accepted, or hard and fast rule for the characterization of buildings of this character accepted everywhere by everybody."   But that, "generally speaking, the common acceptation of the term, 'an apartment house,' is a house where separate residences are furnished for families," which would include a two-family apartment house.

When the contractor had just begun work on the building for defendants—had "only dug the basement"—the plaintiff called upon the defendants to submit the plans for the house to the directors of the plaintiff company in

accordance with the seventh clause of the restrictions and conditions contained in the deed of Mrs. Elterich. Promptly on April 22, 1919, the defendants submitted the plans to such directors. There is a conflict between the testimony for plaintiff and defendants with respect to what occurred at this meeting of the directors.

According to the testimony for the plaintiff, the following minutes of the meeting of said directors on April 22, which were formally adopted by the board on April 23, correctly set forth the substance of what occurred at said meeting on April 22:

"Minutes of meeting of the board of directors of the Leicht Real Estate Company, Inc.

"At a meeting of the board of directors of the Leicht Real Estate Company, Incorporated, held by adjournment from a meeting of said board, held on April 22, 1919, and adjourned at two P. M. of said day, to be now reconvened and held on this the twenty-third day of April, 1919, at the hour of seven o'clock in the evening at the residence of Mr. Jacob Leicht, the president of the company, at number twelve hundred and one on Huntington Place, in Winona, in Norfolk county, Virginia, with a quorum of directors present as follows:

"Jacob Leicht, Martha F. Leicht and H. C. Sherritt.

"Mr. Jacob Leicht, president of the company, presiding as chairman, called the meeting to order and announced the same open for the transaction of business at the above place, dated and hour:

"The plans submitted by Mrs. Kathryn E. Elterich for the building proposed to be erected by her on her lot number three (3) in block number eight (8), as shown on the plat of said company, in that place in said county, known as 'Winona,' which said lot had recently been conveyed to her by said company, were then presented and inspected

(no specifications being submitted), and after consideration, upon motion duly made and unanimously carried,, it was ordered and directed that said plans be approved, UPON CONDITION that there shall be no kitchen or kitchen plumbing upon or in the second floor of said building, and upon the assurance of said Mrs. Kathryn E. Elterich that said building is not being or to be constructed for use as an apartment house and that such use is not intended: And upon the further condition that this approval is not to have force or effect until the said Kathryn E. Elterich has signed the said plans in duplicate, with a certified copy of these minutes attached thereto (to each separate plan), to indicate her acceptance of the above conditions. Duplicate copy of said plans to be retained by said company with said certified copy of minutes attached.

"There being no further business, the meeting was then declared adjourned."

The testimony for plaintiffs, of Mr. Elterich and the contractor, is to the effect that the directors, at said meeting on April 22, did not require that any change whatever be made in the proposed construction of the building. That the directors said, in substance, that all they desired was that the writing on the original plans of the second floor above the basement of the words "pantry," "kitchen," and "dining room," as designating those rooms, be altered to the words "closet," "bed room" and "bed room," respectively, and that fair copies of the plans so altered be made and furnished to the plaintiff, so that the plaintiff could have same on file to exhibit to any persons interested inclined to complain on the subject of the character of house defendants were being allowed to erect. That Mr. Elterich agreed to this. That the contractor thereupon, at the time, made the alterations in verbiage aforesaid on the original draft of the plans with a pencil. That the di-

rectors thereupon said that with the understanding that the contractor would have the fair copies of the plans as altered made and furnished to the plaintiff, the contractor could go ahead with the construction of the building. That the contractor did make such fair copies promptly; delivered them to the plaintiff, and proceeded with the erection of the building until stopped by the temporary injunction awarded on the filing of the bill, which was subsequently made permanent.

The testimony of Mr. Shelton (a witness for defendants, who was present at the meeting of April 22), in regard to the correctness of the above copied minutes and with respect to what occurred at such meeting, is as follows:

"I would say that the minutes ought to be corrected to the following extent: I don't remember any question arising about there being no kitchen plumbing. It was understood there was to be no kitchen. The minutes are correct in that Mrs. Elterich was to sign the plans in duplicate after they were again prepared by the contractor, but I don't recollect about the certified copy of the minutes of the meeting being attached thereto. I don't see where that makes any difference, however, I think that is more detail than otherwise. The minds of the parties met after they had discussed the situation. The agreement that Mr. Cox, the general contractor, had was to remake two sheets, I think, or certainly one sheet, in order that the records in Mr. Sherritt's office would be consistent and correct.

"Q. Was anything said at that meeting or any agreement entered into as to the manner or use of the house?

"A. It was frankly stated that some other persons would use those rooms but that the house would not be an apartment house in any sense of the word or used as an apartment house."

*"Cross-Examination.*

"By Judge Willcox:

"Q.  As a matter of fact, Colonel, you thought the parties had reached an adjustment of the matter which was to be carried out by the change in the plans to a certain extent by the contractor, which were then to be submitted to Mr. Sherritt.  Was there any formal resolution adopted on the 22nd while you were there by the board of directors?

"A.  No, not to my knowledge.  I understood that the directors were then in meeting, and we were talking for their benefit.

"Q.  But no formal action was taken by the directors while you were there?

"A.  No formal action was taken in my presence.  It was just agreed that the only thing remaining to be done was that Mr. Cox should put these pages in the final shape that they should be, he having marked them with his pencil to comply with the changes demanded.  That, I think, is the whole thing."

Promptly after the receipt by the plaintiff of the fair copies of the plans, altered as aforesaid, the plaintiff presented such copies to Mrs. Elterich for her signature in duplicate, with a copy of the minutes of the said directors' meeting attached, whereupon Mrs. Elterich refused to sign such plans.  Thereupon, on the next day, the bill in this cause was filed and the preliminary injunction was awarded as aforesaid.

*Thos. W. Shelton* and *Alfred Anderson,* for the appellants.

*H. C. Sherritt, Martin & Martin* and *Thos. H. Willcox* for the appellee.

SIMS, J., after making the foregoing statement, delivered the following opinion of the court:

The questions presented for our decision will be disposed of in their order as stated below:

[1] Is the building proposed to be erected an "apartment house" within the meaning of the sixth clause of the restrictions and conditions contained in the deed to the defendants, the appellants, and hence in violation thereof?

This question must be answered in the affirmative.

No authority precisely in point has been cited before us in argument.

[2] No authorities whatever have been cited in argument for the defendants, except *South & W. R. Co.* v. *Mann*, 108 Va. 557, 62 S. E. 354, and 8 R. C. L. sec. 104, p. 1051, to sustain the following familiar rule, namely: "A deed is construed most strongly against the grantor and in favor of the grantee. This rule has been called one of the most just and sound principles of the law because the grantor selects his own language. * * * If therefore, the deed can inure in different ways, the grantee, it is said, may take it in such way as will be most to his advantage." This rule, however, has no application where, in the light of the surrounding circumstances, the meaning of the language of the deed is plain. *Quod id certum est quod certum reddi potest.*

For the plaintiff are cited the note in 45 L. R. A. (N. S.) 727 *et seq.; Kitching* v. *Brown*, 180 N. Y. 414, 73 N. E. 241, 70 L. R. A. 742; and some other cases which we need not here mention. Those authorities refer, among other things, to the following well understood general rules, which are not controverted in the argument before us for the defendants, namely:

[3] As said in *Kitching* v. *Brown, supra*, 180 N. Y., at p. 419, 73 N. E. at p. 242, 70 L. R. A. at p. 745: "When a word or phrase used in a covenant has more than one meaning, judicial knowledge of existing circumstances and

conditions is indispensable to a correct exposition of the
law upon the subject, and to that end parol evidence is ad-
missible." (Citing cases.) "One of the familiar rules appli-
cable to the interpretation of ambiguous covenants and
agreements is to ascertain, as nearly as may be, the situa-
tion of the parties, their surroundings and circumstances,
the occasion and the apparent object of their stipulations,
and from all these sources to gather the meaning and intent
of their language." (Citing numerous cases.)

[4] As said in the note in 45 L. R. A. (N. S.) *supra,* at p.
727: "Regard must be had to the object which the cove-
nant was designed to accomplish, and the language used
is to be read in an ordinary or popular, and not in a legal
and technical, sense." (Citing numerous cases.)

[5] As said of covenants such as that in question before
us, *Idem.* p. 728: "The language used must be given its
obvious meaning and be construed in accordance with the
intention of the parties, assuming that the restriction was
put into the deed not simply for the benefit of the grantor,
but for the benefit of every owner of property and of every
resident on the street." (Citing a Michigan case, *Harris* v.
*Roraback,* 137 Mich., 292, 100 N. W. 391, 109 Am. St. Rep.
681.)

As said *Idem.* p. 728: "Particular words *in* such a cove-
nant are to be given the meaning that was commonly given
to them at the time the instrument containing the covenant
was executed." (Citing a New York case, *White* v. *Collins
Bldg. & Const. Co.,* 82 App. Div. 1, 81 N. Y. Supp. 434.)

And as said, *Idem.* p. 727: "The primary rule of in-
terpretation of such covenants is to gather the intention
of the parties from their words by reading, not simply a
single clause of the agreement, but the entire context, and
where the meaning is" (otherwise) "doubtful, by consid-
ering such surrounding circumstances as they are presumed

to have considered when their minds met," (Citing a number of cases); "or in connection with the surrounding circumstances at the time the deed was executed." (Citing cases.)

From reading the whole context of the deed in question in the cause before us, in the light of the surrounding circumstances which appear from the statement preceding this opinion, it plainly appears that the restriction with respect to prohibition of the erection of apartment houses was in furtherance of the undertaking which the plaintiff had entered into to develop Winona as a high class residential suburb of Norfolk city.

It is in substance admitted by the appellants that a three family apartment house would be in violation of the sixth clause of the restrictions contained in the deed. The proof shows that the building in question would be a two-family apartment house. We are of opinion that a two-family apartment house would be, in kind, as much a violation of the object which the covenant in the deed with respect to apartment houses (the sixth clause aforesaid) was designed to accomplish as would a three-family apartment house.

Further: We think that when the sixth clause aforesaid is read in the light of the circumstances disclosed by the testimony of the defendants themselves and by the other evidence in the cause, which is set forth or referred to in the statement preceding this opinion, it is plain that the words "apartment house" were used in such clause, not with the meaning that the defendants might erect a building such as was the one exceptional building then existing in Winona, known as the "Neff" residence, which was a two-family apartment house; but with the meaning that the defendants were not to erect such a house, although they would be permitted to erect a house of the same character as that of the president of the plaintiff company, and of all the other large dwelling houses then existing in Wi-

nona, namely, a house larger than necessary for one family, which might be occupied by more than one family, but which would not be constructed with any *separate* apartments suitable for the use of more than one family.

[6] One of the surrounding circumstances, shown by the preponderance of the evidence, as we view it, which perhaps should be specifically mentioned, is that in Winona, and also in Norfolk city, according to the ordinary and popular understanding at the time the deed in question was executed, such a building as that proposed to be erected by the defendants would have been considered "an apartment house."

There is evidence for the defendants to the effect that in accordance with the building codes, referred to in the statement preceding this opinion, a building is not defined as an apartment house unless it is constructed *or used* for the separate occupancy of *more than two* families or households. But there is no evidence in the cause tending to show that the parties in entering into the covenant in question in the deed aforesaid contracted with reference to either of those codes. Indeed, by the very terms of the definition aforesaid in such codes, if the building was *used* by more than two families, although not constructed for the separate use of more than one family, the building would be an apartment house. That very thing was unquestionably admissible under the covenant in question, as expressly understood by both parties thereto. This of itself shows that the parties did not contract with reference to the definition contained in such codes. Further: An apartment house, as we understand it, within the definition of said codes, must, according to the requirements of such codes, have a certain construction with a view to safety, sanitation, etc. As said in *Kitching* v. *Brown, supra,* 180 N. Y. 414, 73 N. E. 241 (70 L. R. A. 742), of a definition of a "tenement house" in a statute requiring a certain construc-

tion of such houses with a view to safety, sanitation, etc.: "* * * the definition was coined for a limited and specific purpose. * * * it is obvious, therefore, that this statutory definition, in and of itself, throws no light upon the question before us"—which question was the proper interpretation of a covenant in a deed not to erect a "tenement building" on a certain lot.

[7] 2. Was the objection to the building proposed to be erected by defendants, on the ground that it would be an apartment house, waived by the plaintiff, by what occurred at the board of directors meeting on April 22nd, set forth in the statement preceding this opinion?.

This question must be answered in the negative.

The evidence does indeed show that the plaintiff, at the directors' meeting mentioned, agreed to waive any objection to the proposed building on account of its being constructed into two separate apartments; but, as we think is shown by the preponderance of the evidence, only upon condition that the upstairs kitchen should not be constructed for use as a kitchen, and that the defendant, Mrs. Elterich, would personally agree that the rooms on the second floor above the basement, designated on the original plans, "pantry," "kitchen" and "dining room," respectively, would not be used as such, but only as bed rooms. That is to say (in the language of Mr. Shelton, a witness for defendants), "It was understood that there was to be no kitchen," and that "the house would not be an apartment house *in any sense of the word* or used as an apartment house." (Italics supplied.) This agreement on the part of Mrs. Elterich was to be evidenced by her signing in duplicate the altered copy of the plans designating the rooms in question as "closet" and "bed rooms," respectively, as set forth in the statement preceding this opinion. Mrs. Elterich refused to sign such plans and refused to enter into such an agreement, and both of the defendants insisted upon their right

to proceed with the construction of the building without any actual alteration of the original plan of construction, which included the construction of the upstairs kitchen in a way to make it suitable for use as a kitchen, and which, of course, included the necessary plumbing of a kitchen, etc. In view of such failure of defendants to comply with the condition aforesaid, the waiver on the part of the plaintiff predicated thereon, never came into effect.

The precise point of difference between the plaintiff and the defendants on the subject under consideration is that defendants claim that no objection to the proposed construction of the building itself existed on the part of the plaintiff. That all the plaintiff demanded was that the plans for the second floor above the basement should not disclose on their face that rooms on that floor were to be constructed and used as a separate pantry, kitchen and dining room, respectively, from those on the floor below. That the plaintiff was entirely willing that such actual construction and use should proceed; whereas the plaintiff claims that its objection in the premises was a substantial objection, which went to the actual construction of the upstairs kitchen as a kitchen and to the use of the second floor as a separate apartment from that below. We are of opinion that the preponderance of the evidence sustains the claim of the plaintiff.

It may be that the defendants may have considered that by what occurred at the April 22 meeting of the board of directors, the plaintiff had in effect waived the aforesaid sixth covenant in the deed, and had stipulated in lieu thereof for a personal agreement of Mrs. Elterich which amounted substantially to nothing. It is not uncommon for a party to erroneously convince himself that he has secured an agreement which will operate wholly in his favor. There was room in the case before us for such a misunderstanding on the part of defendants as to the result of the April

22 director's meeting.    But we are satisfied that the evidence shows that when the deed was made the minds of the parties met on the sixth covenant with the meaning which we have held above its words import; and while it may be true that their minds did not meet on the subsequent agreement, which is relied on by defendants to discharge the former covenant, that fact, instead of sustaining, is sufficient of itself to defeat such claim of the defendants, the fact being that the defendants did not perform the condition aforesaid as it was stipulated by the plaintiff.

The decree under review will be affirmed.

*Affirmed.*