# CIRCUIT COURT OF THE CITY OF CHARLOTTESVILLE

Margaret Kern,
Executrix of
the Estate of
Margaret Mayo,
deceased

v.

Preston Court,
Limited Partnership

February 7, 2002

Case No. (Chancery) 01-113

BY JUDGE EDWARD L. HOGSHIRE

## I. *Findings of Fact*

A. *The Restriction*

Defendant Preston Court, Limited Partnership ("Preston Court") owns a certain parcel of real property located in the City of Charlottesville, Virginia, described as Lot Nos. 12 and 13 on Plat of Preston Place recorded in the Office of the Clerk of the Circuit Court of the City of Charlottesville in Deed Book 34, Page 478 ("Preston Court Property").

Plaintiff Margaret Kern is the duly qualified executrix of the Estate of Margaret Mayo, who died on April 21, 2001. Mayo was the owner of a parcel of real property adjacent to the Preston Court Property and described as Lot A on a plat by B. Aubrey Huffman & Associates, Ltd., dated November 30, 1998, recorded in the Office of the Clerk of the Circuit Court of the City of Charlottesville in Deed Book 522, Page 37 ("Mayo Property"). Kern is the

devisee of the Mayo Property under the Last Will and Testament of Margaret Mayo, admitted to probate in the Charlottesville Circuit Court.

The Preston Court Property is subject to a restrictive covenant found in a deed dated July 24, 1928, which prohibits the erection of "[an] apartment house, store, or gasoline filling station" on the Preston Court Property ("Restrictive Covenant"). Pl. Ex. 1. The Mayo Property enjoys the benefit of the Restrictive Covenant. Pl. Ex. 1.

## B. *The Proposed Development*

On May 8, 2001, the City of Charlottesville Planning Commission conditionally approved a site plan submitted by Preston Court ("Site Plan"), which envisions the construction of seven attached houses on the Preston Court Property ("Development"). T. at 92, 94.

For its Development, Preston Court proposes to construct seven distinct housing units on the Preston Court Property. T. at 94. The Property will be subdivided into seven distinct lots and each housing unit will be built on its own parcel of land. T. at 79, 95; Def. Ex. 3, 4, and 5. *See also* T. at 156 ("it is a fact that we have not refuted that the defendant intends to subdivide the two lots into seven lots."). Each house will have its own entrance, and each house will have a separate garage entrance. T. at 94.

The houses will be three to four stories in height. T. at 94. Each house will have its own roof. T. at 94. While each house will be built on its own lot, the houses will be separated by a common wall that is situated on the property lines. T. at 96.

Besides sharing a common wall, the houses will not share any other elements. T. at 96. There will be no access between the houses. None of the houses will share a common stairway. There will be no central lobby, nor will there be common elevator service or a common entrance. T. at 94, 96. The houses will not share a common recreational area. T. at 96. The houses will not share common areas for the preparation of food or doing laundry, nor will there be common storage areas. T. at 97. The houses will not share utilities. T. at 98. Each house will have its own gas line, water line, and sewer line. T. at 97-98; Def. Ex. 4.

The ownership of the seven lots, once they are subdivided, will remain with Preston Court. T. at 85. While Preston Court intends to rent each house of its proposed Development, once Preston Court completes construction of the proposed Development, nothing will preclude Preston Court from selling each house to separate owners. T. at 85-86.

Plaintiff does not contend that any one of the housing units standing alone would constitute an apartment house.

During the 1920s, there existed two distinct building types: the apartment house and the row house. T. at 125, 127. Each building type presented its own unique physical and functional characteristics. T. at 125-29.

## C. *Apartment Houses in the 1920s*

In the 1920s, the term "apartment house" was synonymous with the term "apartment building." Random House, *Unabridged Dictionary* (2d ed.), Pl. Trial Brief Ex. 3. *See also The Oxford English Dictionary* (2d ed. 1989).

During the 1920s, Charlottesville, Virginia, experienced a growth in apartment house construction, as evidenced by the increased listing of apartment houses in the Charlottesville Business Directory from 1919 to 1931. T. at 125; Def. Trial Brief Ex. 3, 4, and 6.

Several examples of apartment houses constructed before 1928 can be found in the Charlottesville Business Directory and are located near the Preston Court Property. T. at 127.

The parties agree that the Charlottesville Business Directory for the period 1919 through 1931 lists a number of buildings under the heading "Apartment House" or "Apartment Buildings." T. at 47, 125. *See also* Def. Trial Brief Ex. 3, 4, and 6. All of the buildings listed under the heading "apartment house" or "apartment building" in the Charlottesville Business Directory for the period 1919 through 1931 share common architectural and functional characteristics. T. at 125. *See also* Def. Trial Brief Ex. 5; Pl. Trial Brief Ex. 1.

Apartment houses listed in the Charlottesville Business Directory were constructed as a single building and they were built on a single parcel of land. T. at 125. The apartment houses are multiple stories, three to four stories high. T. at 125-26. One roof covers the entire apartment house, and, inside each apartment house, one can find a number of individual apartments that could be accessed through common spaces. T. at 126-27. The apartment house also provides one or more primary exterior entrances that can be used by all tenants. T. at 125. Each exterior entrance connects internally with common elements, such as hallways, lobbies, and stairways that provide the internal access to each of the individual apartments. T. at 125-26.

The Preston Court Apartment House is located on a hill in close proximity to the Preston Court Property, and a person standing on the Preston Court Property at the time of the construction of the Preston Court Apartment House could have seen it. T. at 75, Def. Ex. 1. The Preston Court Apartment House was built in 1928. T. at 68. Consistent with other apartment houses listed in the Charlottesville Business Directory during the period at issue, the Preston Court Apartment House is a single, multi-story building, with a single

roof, that contained a number of individual apartments. T. at 72-73, 125-126. The Preston Court Apartment House has common entranceways that are accessible by all tenants and that lead to individual apartment units. T. at 72. The Preston Court Apartment House also has common hallways and stairways. T. at 73.

In addition, the Preston Court Apartment House provided its tenants with common utilities, electricity, heat, and water. T. at 73. It also had a laundry facility accessible by all tenants. T. at 73-74.

A news article published before completion of the Preston Court Apartment House states the "name of the *apartment house* will be Preston Court. ..." Def. Ex. 1 (emphasis added). The article further states that it was expected "that the apartment will be ready for occupancy on or before Oct. 1st, 1928." *Id.* The design and structure of the Preston Court Apartment House are consistent with apartment houses found in Charlottesville and elsewhere during the 1920s. T. at 125-26.

There is no evidence of any situation in Charlottesville in the 1920s where the construction of seven, side by side, three to four story units was termed an "apartment house." T. at 163.

### D. *Row House*

The row house as an historic or traditional definition of a building type can be found as early as the 1700s and 1800s. T. at 128. The row house was not a common building type in Charlottesville in the 1920s. T. at 127. In the 1920s, that building type tended to be found primarily in larger urban areas. T. at 127-28.

A row house as a building type is generally characterized as a group of individual buildings that are connected by a common side wall. T. at 128. The common side wall is generally the only common element within the row house building type because each building has its own exterior entrance or entrances. All of the internal space for each building is for the individual row house only and there are no shared or common elements. T. at 128.

Two examples of row houses exist in Charlottesville. T. at 128. Their construction predates the 1920s. T. at 128. One is located on Jefferson Street and the other is located in the Court Square area. T. at 128. However, in 1928 there were no "row houses" in Charlottesville with more than two attached units. T. at 147. In Charlottesville in 1928, there were no "row houses" with a parking lot or common driveway separating the structure from the street. T. at 148.

In more recent times, the historic row house designation of a building type has become known as a townhouse. T. at 121.

*E. The Proposed Development Would Have Been Considered a Row House in the 1920s*

In the 1920s, the proposed Development would have been known as a row house development. It would not have been called an apartment house. The terms "row house" and "apartment house" were not synonymous, nor were they used interchangeably, in the 1920s in Charlottesville.

Unlike apartments houses, row houses built before or during the 1920s generally consisted of multiple houses in a row that are connected by common side walls but have multiple roof forms. T. at 127-28. Each row house is located on its own parcel of land. T. at 128. Each row house contains one dwelling, with one or more building stories, between the side walls. T. at 128.

## II. *Conclusions of Law*

Covenants restricting the free use of land "are not favored, and the burden is on him who would enforce such covenants to establish that the activity objected to is within their terms." *Jernigan v. Capp*, 187 Va. 73, 78, 45 S.E.2d 886, 889 (1948) (quoting *Schwarzschild v. Wellborne*, 186 Va. 1052, 1058, 45 S.E.2d 152, 155 (1947)); *see also Waynesboro Village, L.L.C. v. BNC Properties*, 255 Va. 75, 80, 496 S.E.2d 64, 67 (1998). Restrictive covenants "are to be construed most strictly against the grantor and persons seeking to enforce them, and substantial doubt or ambiguity is to be resolved in favor of the free use of property against restrictions." *Jernigan*, 187 Va. at 78, 45 S.E.2d at 889.

"This rule has been called one of the most just and sound principles of the law because the grantor selects his own language." *Elterich v. Leicht Real Estate Co.*, 130 Va. 224, 238, 107 S.E. 735, 739 (1921). The guiding principal in the construction of a restrictive covenant, as with any written instrument, is the intention of the parties. *See Great Falls Hardware Co. of Reston v. South Lakes Village Center, Ltd.*, 238 Va. 123, 125, 380 S.E.2d 642, 644-45 (1989).

When the terms of a restrictive covenant "are clear and unambiguous, the language used will be taken in its ordinary signification, and the plain meaning will be ascribed to it." *Marriott Corp. v. Combined Properties, Ltd.*, 239 Va. 506, 512, 391 S.E.2d 313, 316 (1990). It is axiomatic that "specific words in a covenant will be given the common, ordinary meaning attributed to them at the time when the instrument containing the covenant was executed." *Marriott Corp.*, 239 Va. at 512, 391 S.E.2d at 316 (1990)

(emphasis added); *see also Elterich*, 130 Va. at 239, 107 S.E. at 740 ("particular words in a covenant are to be given the meaning that was commonly given to them at the time the instrument containing the covenant was executed.") (citations omitted).

Kern argues that there is no evidence that the term "row house" was used in Charlottesville in 1928 and that therefore there is no basis that the grantors might reasonably have been expected to use such a term in attempting to restrict the type or density of residential use. Pl. Trial Brief Paragraph 7. Kern thereby demonstrates the ambiguity of the word "apartment house," and "ambiguity is to be resolved in favor of the free use of property against restrictions." *Jernigan*, 187 Va. at 78, 45 S.E.2d at 889.

Kern has not met her burden of proving that the seven attached houses to be constructed on the Preston Court Property constitute an apartment house as that term was commonly understood in 1928.

From all of the evidence, it was established that the parties to the Restrictive Covenant, in using the term "apartment house," were most likely to have meant to preclude the construction of buildings then in existence which were described as "apartment houses" in the Charlottesville Business Directory for the period.

All of those buildings have common characteristics, which the Preston Court Development does not share. In the 1920s, particularly in Charlottesville, Virginia, the term "apartment house" or "apartment building" was commonly used to describe a single, multi-story building, existing under a single roof, that contained a number of individual apartment units. The apartment house generally had a common entrance that led to common internal features, such as hallways, stairs, and elevators that all tenants used to access their apartments.

Various courts, including the Virginia Supreme Court, have defined the term "apartment house" in the 1920s as commonly describing "a building containing a number of separate residential suites, but usually having conveniences, such as heat, elevator service, etc., furnished in common." *Jernigan*, 187 Va. at 80, 45 S.E.2d at 890 (citing *Webster's New International Dictionary 2d*); *see also White v. Collins Building and Const. Co.*, 82 A.D. 1, 4 (N.Y. App. 1903) ("an apartment house is a building used as a dwelling house for several families, each family living separate and apart from the others ... each separate family uses the main hall for an entrance to the building."); *see also Kitching v. Brown*, 73 N.E. 241, 244 (N.Y. 1905) (an apartment house is "[a] building arranged in three or more suites of connecting rooms, each suite designed for independent housekeeping but with certain mechanical conveniences, as heat, light, or elevator service, furnished in common to all families occupying the building.") (quoting *New*

*International Encyclopedia* of 1903); *Scarlan v. LaCoste*, 149 P. 835, 837 (Colo. 1915) (citing definition of apartment house set forth in *White*); *Konick v. Champneys*, 183 P. 75, 77 (Wash. 1919) (apartment house is "a building arranged in several suites of connecting rooms, each suite designed for independent housekeeping, but with certain mechanical conveniences, such as heat, light, or elevator services, in common to all families occupying the building."); *Creedon v. Lunde*, 90 F. Supp. 119, 119 (W.D. Wash. 1947) ("an apartment house ... is defined as follows: 'a building comprising a number of suites designed for separate housekeeping tenements, but having conveniences such as heat, light, elevator service, etc., furnished in common.") (quoting *Webster's New International Dictionary*).

The Virginia Supreme Court has addressed the definition of apartment house under deed restrictions created in 1916 and 1929. In *Elterich*, the Virginia Supreme Court addressed whether a proposed development in the City of Norfolk, Virginia, violated a 1916 restriction that precluded the construction of a "flat roof or double house, storehouse, factory, building, or apartment house." The proposed development consisted of:

> a two story dwelling house, in addition to the basement, with but one outside front door and one outside back door, but both of such doors opened in front and rear vestibules, respectively, from which vestibules there were separate front and rear entrance into two separate apartments, one apartment on the first floor above the basement ... and the other apartment, on the second floor, being the exact duplicate of the first floor ... so as to be suitable for the separate occupancy of the building by the families. ...

130 Va. at 237, 107 S.E. at 738.

The Court in *Elterich* read the restrictive covenant "in light of the surrounding circumstances" and determined that the restriction against apartment houses was "in furtherance of the undertaking which the plaintiff had entered into to develop [the surrounding property] as a high class residential suburb of Norfolk City." 130 Va. at 240, 107 S.E. at 740. The Court found that "according to the ordinary and popular understanding at the time the deed in question was executed, such a building as that proposed to be erected by the defendants would have been considered 'an apartment house'." *Id.* at 241, 107 S.E. at 740. Significantly, the property at issue was a single building, built on a single parcel of land, and it shared common elements between the apartments.

In *Jernigan*, the Supreme Court addressed the application of a 1929 covenant to defendant's proposal to construct a one-story, four-family

apartment building. 187 Va. at 75-76, 45 S.E.2d at 887-88. The restrictive covenant provided: "only one residential building ... shall be erected on any lot" in the subdivision and that "the use of the land shall be restricted to residential purposes ... ." *Id*. In finding that the restrictive covenant did not prohibit the construction of the apartment house, the Supreme Court noted that "the restrictions do not, in express terms, forbid the erection of 'an apartment house' or 'a multiple family residence.' Nor do they limit the type of a permitted building to 'a single family dwelling,' 'a single family residence,' 'a single family house,' 'a single detached dwelling.' None of these or other expressions of like clear import are used." *Id*. at 79, 45 S.E.2d at 889. The Court held that the proposed structure clearly met the first stated purpose, for a single building was to be erected on a single lot. *Id*. at 80, 45 S.E.2d at 889. The Court then addressed whether the proposed structure was "a residential building." In so doing, the Court noted that an " 'apartment house' is defined ... as: 'A building containing a number of residential suites, but usually having conveniences, such as heat, elevator service, etc. furnished in common'." *Id*. at 80, 45 S.E.2d at 890. The Court therefore concluded that the proposed structure was to be used for residential purposes, in conformity with the restriction, as distinguished from business or commercial purposes. *Id*.

The decisions in *Elterich* and *Jernigan* clearly reflect the Court's understanding that, in the 1920s, an apartment house was a well-known term that described a single structure, which contained a number of residential units that shared common conveniences. The apartment house in *Elterich* was a single structure, with multiple apartments that shared common front and rear vestibules. Likewise, the definition of "apartment house" supplied by the Court in *Jernigan* describes an apartment house as a single structure with multiple apartments having common conveniences, such as heat and elevator service.

In the case at bar, the deed containing the Restrictive Covenant does not preclude the subdivision of the Preston Court Property. As a result, Preston Court is entitled to construct seven detached houses on the Preston Court Property. Further, Preston Court may sell the seven houses, whether detached or not, to seven different owners. In that case, each house would be separately subject to the Restrictive Covenant. It is plain that the Restrictive Covenant does not restrict the construction of a house on the property, nor does it preclude the construction of seven houses. Plaintiff's counsel conceded at trial that, if the Development was to be a series of houses that was separated by inches, then his client would be here on a different basis. T. at 64. Since the Restrictive Covenant does not preclude the construction of seven houses separated by inches, then it does not preclude the construction of seven

houses sharing a common wall. The fact that the seven houses share no common architectural or functional features or conveniences besides common walls is most consistent with row houses of the 1920s, not apartment houses. Thus, the Development, as described in the Site Plan, is not subject to the Restrictive Covenant contained in the Deed.

Judgment is entered in favor of Preston Court, and Kern's Bill of Complaint is dismissed with prejudice.