101 P.2d 391

**ROWE v. MAY et al.**

No. 4513.

Supreme Court of New Mexico.

March 13, 1940.

Rehearing Denied April 30, 1940.

Barnes & Corey, of Albuquerque, for appellant.

W. A. Keleher, A. H. McLeod, and F. O. Westerfield, all of Albuquerque, for appellees.

MABRY, Justice.

The question here involves an interpretation of certain language contained in a deed and a determination whether, under such language and the facts and circumstances shown, a building restriction upon the lot in question is of such a character as to be binding upon appellant. More particularly there is involved the question of whether the building restriction language of the deed is a covenant running with the land, and which is for the benefit of all purchasers and owners of lots within the area, or whether the language constitutes merely a condition subsequent, enforceable only by the original grantor, and those in privity with him, a right not assignable.

The area in question is in a residential section within the city of Albuquerque and known as the Luna Place Addition. Appellant, hereinafter to be referred to as the plaintiff, desiring to build an apartment house within the area upon certain lots recently purchased and meeting with objection from other property owners therein, brought suit against a large number of defendants to have determined her rights under said deed. She prayed for an adjudication against defendants (which included all owners and lien-holders of property within the addition) that the restrictive covenants or conditions in the muniments of title under which all the parties held are void and of no effect and that plaintiff at least should have the right to enjoy the use of her premises without restriction.

While other and additional points upon which plaintiff would rely to sustain her action were raised below, it is agreed by parties appellant and appellees that all that is necessary for a determination of the case upon appeal, is to resolve the question hereinbefore first set out—to interpret the restrictive language to be either a covenant running with the land for the benefit of all the owners, or to be a condition subsequent, and then apply the rules of law applicable.

Defendants contend that the restrictions referred to were not only common to each and all the lots originally conveyed by the corporation subdividing and planning the area, but that this was a part of a general plan and scheme on the part of the original grantor, clearly inferable from the character of the restrictions, to enhance the value of the addition as a high class residential area, and that such restrictions were therefore of the kind which might be enforced by each and all other lot owners within the addition.

Plaintiff argues that the restrictions constitute nothing more than conditions subsequent, made for the benefit of the original grantor himself and for which the right to impose such restrictions upon the grantee a consideration was required, as recited in the deed; that plaintiff had no actual notice of the uniformity of this restrictive language appearing in other deeds from said grantor and that she is not bound to look beyond the clear and unambiguous language of her own deed and others in her chain of title to determine what right of enjoyment in her property, if any, is denied her.

Plaintiff, at the time she purchased her property and prepared to build, had no actual knowledge of anything which would put her on notice of any claim of any restriction upon her right of enjoyment beyond that which was actually contained in the language of her own deed and others in her own chain of title, and the physical appearance of the surrounding properties in the subdivisions; the recorded dedicatory plat of said addition carried no mention of the restriction. The corporation platting, dedicating and originally selling the lots of the addition is here making no claim for right of reverter or otherwise, such defendant having defaulted in making answer.

The restriction (the covenant *or* condition) written into the original deed by the grantor company is as follows:

"the said party of the second part in consideration of the premises and of the sum of $1.00 to ———— in hand paid by the party of the first part, the receipt whereof is hereby acknowledged, for ———— self and ———— heirs, and assigns, hereby *covenants* and *agrees* with the said party of the first part, its successors and assigns, that the said party of the second part ———— heirs or assigns shall not erect or place upon said premises or permit or suffer to be erected or placed upon said premises or any part thereof any building or buildings other than dwelling houses and such barns and other out-houses as may be necessary in connection with the use of said premises for dwelling purposes, and no dwelling house and accompanying barns and outbuildings shall be of less value than three thousand dollars, and no such buildings shall be placed nearer than thirty feet from the property line adjoining any avenue, boulevard, street or highway in said Luna Place, nor shall any building erected or to be erected upon said premises be used as a store, saloon, tenement house or for any other purpose than as private dwelling places.

"If at any time the said party of the second part ———— heirs, assigns, or successors in interest or those holding or claiming there-under, shall violate any of the covenants and agreements herein contained either directly or indirectly, the title hereby granted shall revert to and revest in said party of the first part, its successors and assigns, and it the said party of the first part, its successors or assigns shall be entitled to the immediate possession of said premises. It is hereby expressly understood and agreed that the *covenants* and

*agreements* herein contained are binding upon the successors, heirs, and assigns of the respective parties hereto, and that said *covenants* above specified shall *attach to and run with the land hereby conveyed."* (emphasis ours)

Only in the event that the above language may be construed as a mere personal covenant, or as a condition subsequent, upon which the grantor only or those in privity of blood with him may rely, as distinguished from a covenant running with the land and for the benefit of all property owners within the restricted area, might plaintiff prevail. This assumes, of course, that the language is sufficiently unambiguous that oral testimony would not be needed or permitted to explain the terms.

In addition to passing upon the language and holding that it was clearly a covenant running with the land and for the benefit of all lot owners within the restricted area, the trial court also heard evidence and made findings of fact and conclusions of law supporting defendant's theory and position that it was the *intention* of the corporation subdividing the addition and selling to adopt a uniform plan and scheme to make this a high class residential district with like *building restrictions going into all deeds from such grantor.*

Appellants did not bring up by bill of exceptions any of the testimony or other evidence upon which the trial court's findings and conclusions of law in this respect were based, and therefore the question of whether the findings and conclusions are supported by substantial evidence is of course foreclosed. It has been suggested by counsel on both sides, however, that this does not become important since a proper interpretation of the foregoing language of the deed and the proper application of the law thereto will determine the issue here presented. · Nevertheless, we do not confine our consideration of the question to the language of the deed alone.

 "Conditions which, if enforced, work a forfeiture of the estate are not favored in the law, and are to be construed strictly and most strongly against the grantor." Berger v. Santa Fé College, 28 N.M. 545, 549, 215 P. 825, 826. Likewise, "conditions tending to destroy estates are not favored in law and are construed strictly." 8 R.C.L. 1110, par. 171; and, the burden is on the party claiming to show that the restriction relied upon runs with the land. Lovell v. Columbia Nat. Life Ins. Co., Mass., 2 N.E.2d 545.

In the case of Monk v. Danna, Tex.Civ. App., 110 S.W.2d 84, 86, although holding against the right of one grantee to enforce a building restriction against another, for reasons not important in a consideration of this case, the court nevertheless recognized the doctrine that where an owner of a tract subdivides and sells under a general plan of restriction such restriction may be enforced by one grantee against another. This is upon the ground, the court holds, that there is "mutuality of covenant and consideration", or, that it is upon the ground that "mutual negative equitable

easements are created." In the case of Eagle Bay Park Ass'n et al. v. Longstaff, 1939, 256 App.Div. 1036, 10 N.Y.S.2d 814, 815, the right to enforce such restrictions against others than the grantor was upheld without any discussion of the question whether party complained against had notice of the restriction other than such as is implied by the common restriction in all deeds in the addition. In this quite short, and not too helpful, opinion there is found, however, the broad statement that "the plaintiff's right to relief arises out of a series of deeds conveying to different parties lots in Eagle Bay Park."

In the case of Edgewater Beach Hotel Corp. et al. v. Bishop et ux., 120 Fla. 623, 163 So. 214, relief was denied because of the general change in character of the district since the area was platted and the lots sold, and for the additional reason that deeds from the original grantors did not carry such restrictions uniformly as to all purchasers, but nevertheless the court approved the general rule that upon violation of such building restrictions relief is available inter se purchasers where scheme of restriction is universal and reciprocal.

It may be shown from the terms of the instrument as well as from the situation and surrounding circumstances that benefits were intended to attach to other parcels of land of other grantees. Lovell et al. v. Columbia Nat. Ins. Co. et al., Mass., 2 N.E.2d 545.

Restrictions need not cover every lot, nor need there be absolute identity of restrictions upon different lots to support the theory or scheme, but extensive omissions or variations would be fatal. Snow v. Van Dam, 1935, 291 Mass. 477, 197 N.E. 224.

Relief was denied in Tindolph et ux v. Schoenfeld Bros., Inc., 157 Wash. 605, 289 P. 530, for the reason that nearly one half of the lots of the area were sold free of building restrictions, the court reasoning that the party complaining was thus unable to establish any general scheme or plan applicable to the entire property. But it was indicated, however, that but for this failure to show a general plan, relief would have been afforded. The court also there refers to the New Jersey case of De Gray v. Monmouth Beach Club House Co., 50 N.J.Eq. 329, 24 A. 388, 392, and approves the reasoning thereof in its treatment of such covenants.

In the case of Virgin v. Garrett, 233 Ala. 34, 169 So. 711, the court held that whether a building restriction contained in a deed is to be for the benefit of owners of other property need not be expressed either *verbally* or in *writing*, but may be inferred from circumstances and terms of the instrument, the test being the *intention of the grantor* in creating the restriction, which intention may be proved as any other fact.

Plaintiff relies strongly on the case of Werner v. Graham, 181 Cal. 174, 183 P. 945, followed and approved in McBride v. Freeman, 191 Cal. 152, 215 P. 678. The soundness of the reasoning supporting these cases is severely challenged by the logic

employed to obtain contrary results by many others, and a majority of the cases. California courts seem yet to require that the deed itself, or a declaration in the dedication of the plat, must contain language giving to the purchaser notice if the building restriction is to be considered as a covenant running with the land and for the mutual benefit of all owners.

The well reasoned case of Cheatham v. Taylor et al., 148 Va. 26, 138 S.E. 545, 550, provokes an earnest examination into the holding of the California courts in this connection. In a lengthy and logical discussion of the question, the Virginia court held in line with what it conceives to be the almost unanimous holding that, where a common grantor had created building restrictions, common to all deeds and as covenants running with the land, equity would entertain a suit by any grantee to enjoin a violation of such restriction by another. That court further observed that in "no one of the last three mentioned [two of California] cases was there any [reference to a] 'covenant running with the land,' or anything like it, and in the last-mentioned case [McBride v. Freeman, supra] there seems to be a plain intimation that, if the deed had contained such a covenant, a court would have granted the relief prayed for."

As was pointed out in the Cheatham case, "A restricted building line would be of little advantage to one lot unless it was extended to practically all, and, when the common grantor made the restriction in each conveyance * * * it must have been intended for * * * its grantees, antecedent and subsequent, as well as for itself."

This Virginia court justifies, or excuses, the California courts in their adherence to the minority theory adopted in Werner v. Graham, supra, upon the ground that, when this holding was thereafter attacked in the California courts it had then become too well settled as a rule of property to be disturbed. In the case of McBride v. Freeman, supra, it is conceded that the holding there was against the great weight of authority, while maintaining, nevertheless, that the reasoning by which the results were reached in this and the Werner case was sound, and that in any event, a rule of property not to be now disturbed had thus been established. See also Elterich et al. v. Leicht Real Estate Co., Inc., 130 Va. 224, 107 S.E. 735, 18 A.L.R. 441; Clarke v. Miller et al., 149 Va. 251, 141 S.E. 141; Stevenson v. Spivey, 132 Va. 115, 110 S.E. 367, 21 A.L.R. 1276, 1277; Sanborn v. McLean, 233 Mich. 227, 206 N.W. 496, 60 A.L.R. 1212.

It was held in the two Kentucky cases of Biltmore Development Co. v. Kohn, 1931, 239 Ky. 460, 39 S.W.2d 687, and Greer v. Bornstein, 1932, 246 Ky. 286, 54 S.W.2d 927, that though the recorded plat of the subdivision in question contained no statement of the restriction or of any general scheme of development, yet where uniform restrictions were embodied in all deeds to lots in the area, and all lots in the subdivision had been improved in manner

substantially conforming to the general scheme, a purchaser of a lot in such subdivision was charged with notice of the general plan for uniform development and another purchaser could enforce restrictions against him.

In determining whether the restriction was for the benefit of adjacent lots and parcels of ground, an important evidentiary circumstance is that similar restrictions were inserted in other deeds conveying such other lots and parcels, it was said in Coughlin v. Barker, 46 Mo.App. 54: "If the general observation of the restriction is in fact calculated to enhance the values of the several lots offered for sale, it is an easy inference that the vendor intended the restriction to be for the benefit of all the lots, even though he might have retained other land the value of which might be similarly enhanced." 14 Am.Jur. 655, par. 314.

In McRae v. Lois Grunow Memorial Clinic, 1932, 40 Ariz. 496, 14 P.2d 478, 479, we find circumstances almost identical with those we have here, there being in the deed there under consideration a provision that all conditions and stipulations therein contained shall "run with the land," and upon breach of any of them, the property was to revert to the grantor, its successors or assigns. There was likewise the provision that the heirs and assigns of the grantee were bound by the conditions and stipulations of the deed. The court there held that the restrictions were clearly for the benefit of all grantees and that they were enforceable, one against the other.

In the case of Stephl v. Moore, 94 Fla. 313, 114 So. 455, it was said: "Covenants restraining the free use of real property, although not favored in law, will be enforced by the courts when the restriction applies to the location of buildings to be erected on the land, and such restrictions are carried in all deeds with a view to preserve the symmetry, beauty, and general good of all interested in the scheme of development."

In the case of Ridley v. Haiman, 164 Tenn. 239, 47 S.W.2d 750, 753, it was said: "The general rule is that, where the owner of a tract of land subdivides it and sells the different lots to separate grantees, and puts in each deed restrictions upon the use of the lot conveyed, in accordance with a general building, improvement, or development plan, such restrictions may be enforced by any grantee against any other grantee." See also Laughlin v. Wagner, 146 Tenn. 647, 244 S.W. 475.

To ascertain the intent of the parties to a restrictive covenant in a conveyance of real estate, the language employed to express the covenant should be construed in the light of the whole of the instrument and the circumstances under which it was executed. Heisler v. Marceau, 95 Fla. 135, 116 So. 447. See also Couch et al. v. Southern Methodist University et al., Tex. Civ.App., 290 S.W. 256.

Plaintiff relies upon the fact that there is in the deed the reversion clause, effective to defeat title in the event of violation, and says this strengthens her argu-

ment that the building restriction was intended as a condition rather than a covenant. Plaintiff concedes that if this provision for reversion of title were omitted from the deed, her case would be greatly weakened. We cannot, understand that the presence of this clause in the deed is fatal to a holding that the general undertaking of the instrument is what the parties themselves in plain language designated it to be, namely, a "covenant and agreement", to attach to and run with the land. This might be considered merely an additional right which grantor corporation elected to reserve, to be thereafter relied upon or waived as it might choose.

The subdivider might have reasoned that, to thus more securely fortify against a violation of the grantee's agreement to observe the restrictions would make it all the more certain that the restrictions imposed in the interest of a well laid out and improved residential area would be more faithfully observed. We find no authority which holds that the two provisions are so inconsistent that both cannot stand. It would depend upon who seeks relief because of a broken covenant, or a violated restriction, as to which remedy would be available, and to whom.

The question of inconsistency was not presented or considered in the two cases recently decided by this court and referred to by counsel (Alamogordo Improvement Co. v. Hennessee, 40 N.M. 162, 56 P.2d 1127, and Alamogordo Improvement Co. v. Prendergast, 43 N.M. 245, 91 P.2d 428, 122 A.L.R. 1277), the issue being whether a tax title was destructive of the right of reversion of title because of a property "use" violation, in the first case, and as to the effect of such tax title upon a reciprocal negative easement, in the latter. Yet, there we had under consideration in each of the cases the identical character of restriction common to all lots of the townsite in question, the title reversion clause being interwoven with the restriction against use of the property for a saloon. This restriction we held in the Prendergast case to be for the benefit of all lot owners, enforceable by all as having a valuable right, in the nature of a reciprocal negative easement, which could not be destroyed even by a sale of the property for taxes.

It did not occur to any of the parties to either of these suits, or to the court, that there might be some troublesome involvement in a restriction held to be in the nature of an easement for the benefit of each and every lot owner in the restricted area, where there was also included in the restriction clause, and reserved, a right of reversion in the grantor in case of violation. In the Hennessee case, the reversion clause was relied upon, while in the Prendergast case it was under the reciprocal negative easement covenant that relief was sought and granted.

Aside from any consideration of the circumstances presented by the case at bar favoring the promotion of a high class residential area under which this addition was platted and sold (which the court had a right to, and which it did in fact consider, making findings favorable to defendants),

the language of the covenant itself, identical in all deeds in the area, taken alone, could bear no other reasonable inference than that such deeds from the original grantor, the corporation, gave sufficiently adequate and clear expression to its *intention* that the restriction was for the benefit of *all* the lots (14 Am.Jur. 655, supra), and, that since the restrictions, being of the character they were, and imposed *uniformly* upon *all,* it was inescapable by fair and reasonable inference, that the purpose was to preserve its genuine residential character, the symmetry and beauty of the area, and for the general good of all interested, in making this an attractive and valuable residential district. Stephl v. Moore, supra.

The purpose and intention of the grantor to make the restriction reciprocal and therefore burdening as with notice all persons who should buy lots in the vicinity from the vendor is inferred from the circumstance that a building plan had been devised and declared by him on a recorded plat or tract, or that such plan had been *publicly announced* when the lots in the tract were sold at auction, or had been made known to a private buyer. Doerr v. Cobbs, 146 Mo.App. 342, 123 S.W. 547.

"The right to enforce this restriction upon the use of the land is based, not upon the agreement made by the subsequent purchaser, but upon the theory that each purchaser buying a lot with notice of a general plan of improvement impliedly assents thereto and can be compelled to comply therewith at the suit of the owner of any other lot, without reference to the order in which the lots were sold." Wiegman v. Kusel et al., 270 Ill. 520, 110 N.E. 884, 885, citing 1 Tiffany on Real Property, Par. 352, and other authority.

It was further held in the foregoing case that even the fact that the original owner who imposed the restrictions had thereafter repurchased the lots in question and resold them *without* restrictions, would not change the result nor lift the burden, since it was *intended,* under the general building plan, to benefit the other lots of the area. And it was there further said, in support of the holding that the subsequent purchaser from the original owner must be held to have notice of the general building scheme planned and intended by the original owner: "The evidence on this subject clearly showed a publicly announced plan as to this building line restriction, and also tended strongly to show that all prospective purchasers would understand that this restriction was placed upon all lots sold."

It was said in the case of Elliston v. Reacher, [1908] 2 Ch. 374, 384, in a well considered case in which is discussed the essentials of a scheme which would come within the rule generally relied upon and the conditions under which the covenants would be enforced, that the "vendor's object in imposing the restrictions must in general be gathered from all the circumstances of the case, including in particular *the nature of the restrictions."* (emphasis ours)

The writer of that opinion continues: "If a general observance of the restrictions is in fact calculated to enhance the value of the several lots offered for sale, it is an easy inference that the vendor intended the restrictions to be for the benefit of all the lots, even though he might retain other land, the value of which might be similarly enhanced, for a vendor may naturally be expected to aim at obtaining the highest possible price for his land."

Pomeroy in his fourth edition of "Equity Jurisprudence", vol. 4, par. 1696, thus states the rule upon which the great majority of the courts seem to have relied: "Where an owner of a tract of land lays it out in building lots, makes a plan showing a general building scheme, and sells in accordance therewith to various purchasers, inserting restrictions in all the deeds, the *intent* will be *inferred*. The purpose of the restrictions is clearly to benefit all the land in the tract and to make an inducement for purchase. Accordingly, one grantee may enjoin a breach by another, or by one who takes with notice. Some courts have intimated that either a general building scheme or an express declaration in the covenant is essential; but the better view seems to be that the *intent* may be otherwise determined." (emphasis ours)

Speaking of a distinction sometimes made in the cases when the vendor does not definitely reserve any part of the tract for himself, it was said in the leading English case of *Nottingham Patent Brick and Tile Co. v. Butler*, 16 Q.B.Div. 778, 785: "If he (the vendor) does not reserve any part, that is almost if not quite conclusive (unless there is something contradictory) that the covenants which he takes from the purchaser are intended for the benefit of each purchaser as against others."

There is nothing in the record before us to show that the original corporation vendor, the subdivider, retained any of the lots for its own benefit. It may be assumed from the record before us and briefs, rather, that the original grantor sold all lots in the development and became a dormant or inactive corporation many years ago.

In the case of *Sanborn v. McLean*, 233 Mich. 227, 206 N.W. 496, 497, 60 A.L.R. 1212, the court justifies the imposition of the restriction for the benefit of all lot owners and of which restriction all must take notice, upon the theory that it is a reciprocal negative easement. The court says: "If the owner of two or more lots, so situated as to bear the relation, sells one with restrictions of benefit to the land retained, the servitude becomes mutual, and, during the period of restraint, the owner of the lot or lots retained can do nothing forbidden to the owner of the lot sold. For want of a better descriptive term this is styled a reciprocal negative easement. It runs with the land sold by virtue of expressed fastening and abides with the land retained until loosened by expiration of its period of service or by events working its destruction. It is not personal to owners, but operative upon use of the land by any owner having actual or constructive notice

thereof. * * * It originates for mutual benefit and exists with vigor sufficient to work its ends. It must start with a common owner."

In further discussing the case the Michigan court develops the view approved by many other courts and says with reference to the circumstances there presented, and speaking of the appearance of the buildings and the character of the use made of all the lots, that, as this was "open to a view of Mr. McLean when he purchased, we think, he was put thereby to inquiry, beyond asking his grantor, whether there were restrictions. He had an abstract showing a subdivision and that lot 86 had 97 companions. He could not avoid noticing the strictly uniform residence character given in lots by the expensive dwellings thereon, and the least inquiry would have quickly developed the fact that lot 86 was subjected to a reciprocal negative easement, and he could finish his house, and, like the others, enjoy the benefits of the easement. We do not say Mr. McLean should have asked his neighbors about restrictions, but we do say that with the notice he had from a view of the premises on the street, clearly indicating the residences were built and the lots occupied in strict accordance with a general plan, he was put to inquiry, and, had he inquired, he would have found of record the reason for such general conformation, and the benefits thereof serving the owners of lot 86, and the obligations running with such service and available to adjacent lot owners to prevent a departure from the general plan by an owner of lot 86."

Can it be said that these covenants of restrictions, common to all deeds, confining all buildings to a distance of thirty feet from the property line adjoining "any alley, boulevard, street or highway in said Luna Place" and restricting all buildings to be constructed to dwelling houses to be used only for dwelling purposes, and to cost not less than $3,000 each, could have been understood as intended for any other purposes than as a benefit to all lots of the area? We think not. No other sensible purpose could reasonably have been inferred from such language.

It must be remembered, also, that the trial court refused to find that there had been a sufficient breakdown of the restrictions to justify their removal on grounds of non-observance. This finding plaintiff requested in support of her petition for relief under an alternative. We must, therefore, in view of the findings actually made, indulge the contrary presumption—that the restrictions had been and were then being generally observed by all property owners of the area. So, then, the physical appearance of the addition may be said to present another circumstance which would have put a reasonably prudent person on notice that the lot being purchased was in a fairly high class residential section, laid out and planned as an attractive and restricted district exclusively for residential purposes. Sanborn v. McLean, supra. Probably thirty uniformly high class homes were, we may say, to be found within the

area and occupied exclusively as homes, when plaintiff purchased her lot intending to use it for a purpose clearly not permitted by the terms of her deed, excepting that an escape might be found if no one appeared technically able to challenge her endeavor; if there be no one to insist upon her observing this covenant by which her title was so limited, and by which the value of her own property was, through other owners observing like restrictions, theoretically at least, likewise substantially increased.

It may be said, in fairness to plaintiff, that her anxiety to remove the restrictions was justifiably provoked by the circumstances under which she purchased her lot. The abstract furnished did not show the restrictions; even in her own chain of title. This omission in the abstract, not vital to the rights of other lot owners of the addition since all deeds of record clearly carried this covenant, was evidently disappointing to plaintiff, who purchased her property without actual knowledge of restrictions and for a particular use which such restrictions inhibit. The results of this error in abstracting and the disappointment to plaintiff flowing therefrom, the court is of course helpless to here repair.

We are not unaware that there are some few cases in addition to those of California supporting what might be considered a contrary view to that here expressed, and for that reason we have lengthened this opinion with this rather elaborate citation of authorities. This, we trust, may be helpful in appraising our conclusion, and likewise as supporting our contention that we are expressing the view of the majority holding, and, as we believe, likewise the better reasoned cases. Exhaustive and helpful notes may be found in 21 A.L.R. 1301, 33 A.L.R. 677, 60 A.L.R. 1227, and 89 A.L.R. 812.

We hold the trial court was correct in its ruling that plaintiff's title stands burdened with a right reposing in other lot owners adversely affected, to enforce in equity the building restrictions imposed by these covenants which run with the land.

Finding no error the judgment is affirmed and it is so ordered.

BICKLEY, C. J., and BRICE, ZINN, and SADLER, J., concur.