## Marriott Corporation

### v.

## Combined Properties Limited Partnership, et al.

Record No. 891110

April 20, 1990

Present: Carrico, C.J., Compton, Stephenson, Russell, Whiting and Lacy, JJ.

*Robert H. Loftus (Miles and Stockbridge*, on briefs), for appellant.

*Gerald R. Walsh; Alan H. Silberman (Robert F. Donnelly, Jr.; Jay Conison; William J. Hamel; Walsh & Cremins; Sonnenschein, Nath & Rosenthal*, on briefs), for appellees.

JUSTICE COMPTON delivered the opinion of the Court.

In this dispute arising from competition in the quick service restaurant industry, we consider whether the trial court correctly determined the meaning of the term "drive-in food establishment," as used in a restrictive covenant in a 1967 lease.

In March 1988, appellant Marriott Corporation filed a bill of complaint against its landlord, appellee Combined Properties Limited Partnership, and appellee McDonald's Corporation, seeking a declaratory judgment to block construction of a McDonald's restaurant within 2,000 feet of a Roy Rogers restaurant operated by Marriott. The Roy Rogers (formerly Hot Shoppes, Jr.) restaurant is on premises leased to Marriott in the Pickett Shopping Center in the City of Fairfax. The proposed McDonald's restaurant is to be situated on premises it leased in 1986 from Combined across a street in the Fair City Mall, but only 785 feet from Marriott's demised premises.

Marriott relies on the following paragraph in a 40-year lease executed in 1967 between predecessors of Marriott and Combined:

> "2.3 *Non-Competition*. Landlord covenants that Landlord will not at any time during the continuance of this Lease directly or indirectly engage primarily in the business of operating a drive-in food establishment within an area of 2,000 feet in any direction of the Leased Premises; nor will Landlord, except with respect to present tenants of property owned by Landlord presently engaged in such business, sell, rent, or permit any land owned or controlled by Landlord to be used for such purpose during such period in such area. With respect to property sold or leased by Landlord subject to the restrictions of this Section, appropriate covenants will be made a part of any deed or lease in order to accomplish the objectives hereof. Tenant agrees not to operate directly or indirectly a Hot Shoppes, Jr. within the above described area."

Marriott asserted that drive-in food establishments in 1967 were what are now called fast-food restaurants, and that the prohibition of paragraph 2.3 applied to the proposed McDonald's restaurant. Accordingly, Marriott asked the trial court to declare the proposed establishment a violation of its lease and to permanently

enjoin the landlord and McDonald's from constructing and operating the McDonald's restaurant.

The trial court overruled demurrers filed by defendants and, after amendments were made to the bill of complaint, the parties joined issue. The chancellor heard the evidence ore tenus during three days in May 1989 and ruled from the bench in favor of defendants. We awarded Marriott an appeal from the June 1989 final decree dismissing the amended bill. We also agreed to consider the landlord's assignments of cross-error.

As the chancellor observed at the hearing, there is one, simple, dispositive issue in the case. Yet the parties have over-litigated the matter, building an unnecessarily large record and filing briefs that are verbose, duplicative, and overlong. Indeed, the parties even disagree on the statement of the issue.

The main question on appeal is whether the trial court erred in determining under the evidence that the term "drive-in food establishment" had a common, ordinary meaning in 1967 and referred to a food establishment which, as an essential feature, permitted and encouraged customers to eat food in their motor vehicles while parked on the establishment's lot. The facts presented on the question were in conflict but, according to settled appellate principles, we will state them in the light most favorable to defendants, the parties prevailing below.

■ In 1967, when the lease was negotiated, there was no discussion between the parties' representatives about the meaning of the term "drive-in food establishment." The term was one of common usage and had no special, technical meaning in the food service or shopping-center leasing industries.

■ The language of the disputed covenant was proposed by Marriott. The evidence showed that other restaurant leases negotiated by Marriott contained restrictive covenants prohibiting specific restaurants or "hamburger-oriented restaurants" as well as prohibiting "self-service eat in or take out restaurants." None of these restrictive terms was proposed by Marriott because it "wanted to include the term 'drive-in' in the restrictions."

According to the evidence, there were two types of food service facilities in the 1960's called "drive-in food establishments." One consisted of facilities with carhop or curb service. The customer would park the vehicle on the lot and place an order, either in person to a carhop or through a "car phone." The food was brought to the parked vehicle and the customer would eat it there.

Marriott's Hot Shoppes restaurants were examples of drive-in food establishments with carhop service. Throughout the 1960's, many Hot Shoppes restaurants had "drive-in capability" and used the term "drive-in" on their signs.

The second type of food establishments in the 1960's called "drive-ins" had no carhop service. In those facilities, the customer parked the vehicle on the lot, walked to a service window, purchased the food, and returned to the vehicle, where the food was consumed. The McDonald's restaurants of the 1960's were examples of drive-in food establishments without curb service. By the late 1960's, this type of facility had become the more common; most of the carhops were "gone."

In 1967, when the lease in question was being negotiated, Marriott was competing in the "limited menu, fast service" market in the Maryland-District of Columbia-Virginia area through its Hot Shoppes, Jr., facilities, which were known as "drive-in restaurants." Marriott was seeking "a competitive edge against the market leader . . . McDonald's." According to the evidence, the term "drive-in" was employed in the restrictive covenant "simply because it was the key descriptive phrase of the day" to describe the types of facilities Marriott was developing and the types of establishments operated by its competitors, mainly McDonald's.

During the late 1960's, the nature of the competition among drive-in food establishments was evolving. Owners of many food establishments were attempting to compete with drive-ins either by developing competitive restaurants that were not drive-ins or by changing formats of existing drive-in facilities. These changes included the use of indoor seating and the development of features that did not promote the "eat in the car on the lot" arrangement. For example, Marriott replaced the Hot Shoppes, Jr., facilities with its Roy Rogers restaurants to attract "more of an adult population." The drive-ins had acquired a negative image as places for people, primarily young persons, to loiter on the lot. These quick service establishments "didn't want the reputation of just 'drive-in.' " McDonald's was among the establishments which changed over the years after 1967.

The evolution of the McDonald's establishments is illustrated by the proposed facility which generated this controversy. In 1967, McDonald's "drive-in" restaurants were red and white tile buildings with no dining rooms; customers were encouraged to consume food in their motor vehicles. Today, at least one-half of

McDonald's customers consume food on the premises in dining rooms seating from 100 to 350 persons. The focus is "on the pleasant experience of families eating at McDonald's." Approximately 50 percent of the food served by McDonald's is taken off the lot and consumed outside the restaurant. Presently, less than one percent of McDonald's food is eaten "in cars on the parking lots." The proposed McDonald's will have approximately 122 seats with the construction cost of seating and interior decor to be about $125,000. It will have a "drive through" feature whereby the customer places an order from the vehicle through a "speaker system," receives the food at a window, pays for the order, and drives away.

The trial court, announcing its opinion from the bench at the conclusion of the trial, stated that the "operative question . . . is what did the language, 'drive-in food establishment,' mean to the parties as it was used in this lease." The court determined "that a drive-in was a place to which one went and got quick service either at the car or at the window and was encouraged to, and most people did, eat the food in the car," stating that the proposed McDonald's is not that type of establishment. Accordingly, the court ruled in the final decree that "the proposed construction and operation of the McDonald's restaurant . . . is not a violation of the prohibition of a drive-in food establishment in the non-competition clause" of the lease in question.

On appeal, Marriott argues that the trial court erred in ruling that the "purpose" of the restrictive covenant was "not to provide protection from similar food competition," but only from restaurants where food was consumed "in the car on the lot." Elaborating, Marriott says there was "no dispute" at trial that Hot Shoppes, Jr., and later Roy Rogers, "was what is now called a fast-food restaurant, that McDonald's in 1967 was also what is now called a fast-food restaurant, and that they were direct competitors and have remained so to this day, competing for the same customers with the same style of business and merchandise - fast food." Marriott contends that the trial court mistakenly was convinced "that the market threat perceived by Marriott, and at which the agreement was aimed, was not the sale of similar food products, but businesses whose building facilities were so limited that customers could not carry their food to indoor tables, but could only carry their food out to their car on the lot." We do not agree that the trial court erred.

■ Where, as here, the terms of an agreement are clear and unambiguous, the language used will be taken in its ordinary signification, and the plain meaning will be ascribed to it. *Amos* v. *Coffey*, 228 Va. 88, 92, 320 S.E.2d 335, 337 (1984). And, specific words in a covenant will be given the common, ordinary meaning attributed to them at the time when the instrument containing the covenant was executed. *Elterich* v. *Leicht Real Estate Co.*, 130 Va. 224, 239, 107 S.E. 735, 740 (1921).

Disregarding the covenant's plain meaning, Marriott implicitly seeks to rewrite it to prohibit operation of a "fast-food" establishment which sells food products similar to those dispensed by Marriott's Roy Rogers. The difficulty with Marriott's position is that the clear language of the covenant fails to so provide.

■ Upon conflicting evidence, the trial court determined that the term "drive-in food establishment" meant in 1967 a facility which emphasized eating food in motor vehicles on the establishment's parking lot. Additionally, the trial court determined that the proposed McDonald's restaurant is not prohibited by the covenant because the present-day McDonald's facilities are no longer "drive-in food establishments" as defined in 1967. When a chancellor, after hearing evidence ore tenus, makes findings of fact, the judgment based upon those findings will not be disturbed "unless it appears from the evidence that such judgment is plainly wrong or without evidence to support it." Code § 8.01-680; *Giannotti* v. *Hamway*, 239 Va. 14, 23, 387 S.E.2d 725, 730 (1990). We cannot say that the trial court's findings of fact were plainly wrong or without evidence to support them.

Additionally, the trial court correctly refused to endorse Marriott's view that the definition of the disputed term changed over time and applied to present McDonald's restaurants even though they are no longer "drive-ins" in the 1967 sense.

■ Likewise, we reject Marriott's contention that the trial court committed reversible error in admitting expert testimony "to interpret the intent" of the restrictive covenant. McDonald's presented testimony from a university professor who taught courses in the subject of "Popular Culture," and the witness gave his opinion on the 1967 meaning of "drive-in." Although allowing the testimony, the trial court stated, during the course of his oral opinion, "I am frankly not impressed with the expert and don't rely heavily, if at all, on his testimony." Hence, even if we assume

the court erred in admitting the testimony, the error was harmless in view of the trial court's comment.

Turning to the landlord's assignments of cross-error, we find no merit in any of them. Initially, Combined argues that Marriott failed to prove it will suffer irreparable harm should the permanent injunction fail to issue. In view of our decision on Marriott's appeal, this issue is moot.

The remaining assignments of cross-error attack the trial court's action in overruling the landlord's demurrer. One ground of Combined's demurrer was directed to the plaintiff's allegations (1) that the parties to the lease intended "to restrict competition within the 2,000 foot radius" from the Roy Rogers restaurant and (2) that the location of the proposed facility "is within 2,000 feet of [Marriott's] leased premises." The landlord noted that the covenant speaks only of "a drive-in food establishment within an area of 2,000 feet in any direction of the Leased Premises." It contended that, applying the appropriate mathematical formula by which "area" of a circle is determined ($A = \pi r^2$), a circle with a 50-foot diameter will "encompass 2,000 feet." Attempting to restrict the reach of the covenant, the landlord contended that Marriott incorrectly injects into the measurement of the distance the concept of "radius" which, it said, "is defined as a line segment extending from the center of a circle to the outer curve."

In a letter opinion overruling the demurrer, the trial court addressed this issue. The trial court ruled: "There is absolutely no indication that the parties to the lease intended the word 'area' to be used in a geometric context. It is clear to this Court that 'area' is referring to the collective territory within a radius of 2000 feet from the [Marriott] restaurant."

The landlord makes the same argument on appeal, and we furnish the same response as the trial court. It is equally clear to us that the rather absurd interpretation urged by the landlord was not within the intention of the parties to the lease. We hold that the plain meaning of the territorial restriction provides for inclusion of the collective territory within a radius of 2,000 feet from Marriott's demised premises, not within 50 feet as the landlord theorizes.

The final issue raised on cross-error relates to the fact that Combined acquired the Fair City Mall property, upon which the proposed McDonald's will be situated, after the execution of the lease in 1967. Combined contended on demurrer, as on appeal,

that "Marriott could not enforce a restrictive non-competition covenant upon land not shown by the allegations of the Amended Bill of Complaint to have been within the contemplation of the original parties to the lease nor which was part of the original property interest of the lessor."

The trial court correctly found no merit in this contention dealing with the supposed extra-territorial effect of the covenant. This covenant is personal to the landlord and does not run with the land; it bound the landlord not to allow competition during the term of the lease on "any" of its land within the 2,000-foot restriction. The restricted distance is over twice the distance from Marriott's demised premises to the farthest point of the shopping center owned by the original lessor. As the trial court noted, "This fact indicates that it was within the contemplation of the parties that the lessor might expand its enterprise at some future date."

For these reasons, the trial court's final decree will be

*Affirmed.*