981 F.2d 1253
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
In re: Harold R. WALKER; In re: Carrie Ann Walker, Debtors.
Hunter E. Craig; Stuart MCN. Craig, Plaintiffs-Appellees,
v.
Nettie Marie Jones, Defendant-Appellant,
The Huntington National Bank; Harold R. Walker; Carrie Ann
Walker, Defendants-Appellees.
In Re: Harold R. Walker; In re: Carrie Ann Walker, Debtors.
Nettie Marie Jones, Plaintiff-Appellant,
v.
Hunter E. Craig; Stuart MCN. Craig; The Huntington National
Bank; Harold R. Walker; Carrie Ann Walker;
Jonathan E. Davies, Trustee,
Defendants-Appellees.
 Nos. 92-1221, 92-1222
 United States Court of Appeals,
Fourth Circuit.
 Argued: October 1, 1992
Decided: December 17, 1992
As Amended Jan. 13, 1993.
 
 Appeals from the United States District Court for the Western District of Virginia, at Charlottesville.
 Edward B. Lowry, MICHIE, HAMLETT, LOWRY, RASMUSSEN & TWEEL, P.C., for Appellant.
 Frederick T. Heblich, Jr., PARKER, MCELWAIN & JACOBS, P.C., for Appellee.
 W.D.Va.
 AFFIRMED.
 Before PHILLIPS and WILKINSON, Circuit Judges, and SPROUSE, Senior Circuit Judge.
 PHILLIPS, Circuit Judge:
 
 
 1
 This appeal involves a dispute between two secured creditors of the bankrupt owner of thoroughbred horses over the division of the proceeds of a sale of one of the horses-a foal. The dispute turns on whether the foal was covered by a compromise agreement between the two respecting the sale of some of the horses in the bankrupt's estate. The district court, affirming the bankruptcy court, interpreted the agreement as covering the foal and directed division of the proceeds according to its terms. We affirm.
 
 
 2
 * In February, 1983, Appellant Nettie Marie Jones and Harold R. Walker formed a Kentucky corporation, Example, Inc., for the purpose of breeding horses. In December of that year Mr. Walker purchased Mrs. Jones' capital stock in Example, Inc. through a series of transactions. As part of these transactions, Example, Inc. issued promissory notes of $500,000 and $125,000 payable to Mrs. Jones. These notes were personally guaranteed by Mr. Walker and created a security interest in favor of Mrs. Jones in a horse that eventually was named Zienelle. In November, 1984, Mr. Walker and Mrs. Jones rescheduled the $125,000 note, evidenced by a new promissory note of $75,000 that again granted Mrs. Jones a security interest in Zienelle and in the Jockey Club Certificate of Zienelle's dam, Past Example. The possession of such a certificate is required to race or breed a thoroughbred horse.
 
 
 3
 Mrs. Jones filed a financing statement in Kentucky indicating that Past Example and Zienelle were part of her collateral for Example, Inc.'s debt. Past Example, though, was titled to Mr. Walker and his wife rather than to Example, Inc. Mr. Walker later sold Past Example. In May, 1985, Mr. Walker and Mrs. Jones entered another agreement whereby Mrs. Jones agreed not to claim default on Example, Inc.'s debts in return for: (1) the assignment of a portion of the proceeds from Past Example's sale; (2) Mr. Walker's making interest payments on certain of the outstanding notes by June of 1985; and (3) assignment of the Jockey Club Certificate on certain horses, including Zienelle. Mrs. Jones received this certificate in March 1986.
 
 
 4
 During this period, Mr. Walker was also borrowing from Huntington National Bank ("Huntington"). On November 1986, Mr. and Mrs. Walker executed three loan documents in favor of Huntington, the first being a promissory note for $435,000. The collateral for this note was listed as:
 
 
 5
 Deed of Trust in property located in Albemarle County, Virginia; Thoroughbred Horses; Farm Products; Livestock; Equipment; Inventory; Fixtures; Receivables; and Intangibles.
 
 
 6
 The Deed of Trust referred to gave Huntington a security interest in a farm known as Meridian Farm but did not mention the thoroughbred horses. The Walkers, however, also executed an instrument at this time that granted Huntington a security interest in:
 
 
 7
 All of the Debtor's livestock and rights in all horses and/or livestock and progeny thereof now owned or here after acquired by Debtor, which shall include, without limitation the following horses ... Zienelle.
 
 
 8
 Huntington filed financing statements evidencing its security interest in Zienelle, any of her progeny and the Jockey Club Certificate for Zienelle.
 
 
 9
 In July, 1987, the Walkers filed for bankruptcy under Chapter 11. In August, Example, Inc. also filed a Chapter 11 petition. Both cases were subsequently converted to Chapter 7 cases. At the time of filing, the Walkers' aggregate debt to Huntington was $449,013.06 plus late charges and interest. The Walkers and Example, Inc. also still owed substantial sums to Mrs. Jones.
 
 
 10
 In April, 1988, Zienelle had a foal, for which the stud fee owed to one Peter Savin was $20,000. In July, 1988, Huntington and Mrs. Jones executed a letter agreement providing that certain listed horses were to be sold and their proceeds divided between Huntington and Mrs. Jones. Zienelle was mistakenly left off this list, and in August, 1988, Huntington and Mrs. Jones executed a supplemental letter agreement whereby Zienelle was added to the list.
 
 
 11
 In August, 1988, the bankruptcy court lifted its stay so that Mr. Savin could sell the foal and recover the stud fee for it. This order, drafted by Savin's attorney and signed by counsel for Mrs. Jones and Huntington, provided that "[a]11 excess proceeds shall be paid to the Huntington National Bank and Nettie Marie Jones, jointly." Neither party, however, expected there to be any excess proceeds.
 
 
 12
 In October, 1988, the bankruptcy court entered an order approving the compromise agreement between Huntington and Mrs. Jones that provided:
 
 
 13
 Those horses which have not yet been sold, and on which Huntington claims a lien, will be sold by Huntington upon terms mutually agreeable to Huntington and Mrs. Jones.
 
 
 14
 The terms stipulated by this agreement were that Huntington would receive 70% of the proceeds and Mrs. Jones 30%.
 
 
 15
 Savin sold the foal in November 1989 for $90,000, much more than expected. This left $49,566.12 in net proceeds. In keeping with the 70/30 split of the compromise agreement, these proceeds were divided so that Huntington received $34,699.28 and Mrs. Jones $14,866.84 of these net proceeds.
 
 
 16
 Mrs. Jones challenged this division by a proceeding in the bankruptcy court. She contended that she should have received the entire net proceeds as she held the security interest in the foal and it was not meant to be included among the "horses" referred to in the compromise agreement approved by the bankruptcy court. Among other things, she argued that by terms of that agreement, it covered only horses "sold by Huntington", and that Savin, not Huntington had sold the foal.
 
 
 17
 The bankruptcy court held otherwise, and the district court affirmed its decision. The district court opined that
 
 
 18
 any interest Mrs. Jones may have had in the foal was covered by the compromise agreement approved by the bankruptcy court.... The fact Mr. Savin (and not Huntington) undertook to sell the foal is of dubious import. Mr. Savin sold the foal for his own benefit, and for the benefit of Huntington and Mrs. Jones. If the court were to follow Mrs. Jones' logic, any horse not literally sold by Huntington would be exempt from the agreement. Further, at the time the compromise agreement was both signed and then later incorporated into the bankruptcy court's order, Zienelle's foal was a horse that had not been sold, and was a horse upon which Huntington claimed a lien. The Security Agreement specifically listed Zienelle as collateral for the Walkers' debt. Further, the agreement purported to create a security interest in all of the Walkers' "horses and/or livestock and progeny thereof...." Therefore, any claim Mrs. Jones may have had in Zienelle's foal was extinguished by the compromise agreement approved by the bankruptcy court.
 
 
 19
 Judgment was accordingly entered for Huntington, and this appeal by Mrs. Jones followed.
 
 II
 
 20
 We agree with the district court's interpretation of the compromise agreement and its application to the undisputed facts of the case.
 
 
 21
 Essentially, the district court, affirming the bankruptcy court, applied a plain meaning interpretation to the compromise agreement, concluding that the "horses" intended to be covered by its provisions unambiguously included the foal. We find this analysis a sound basis for decision under Virginia law, which emphasizes the primacy of a "plain meaning" approach to contract interpretation, and a correspondingly stringent application of the parole evidence rule. See, e.g. Marriott Corp. v. Combined Properties, 391 S.E.2d 313, 316 (1990); Amos v. Coffey, 320 S.E.2d 335, 337 (1984).
 
 
 22
 The agreement between Mrs. Jones and Huntington, as approved by the bankruptcy court, provided that "[t]hose horses which have not yet been sold, and upon which Huntington claims a lien, will be sold by Huntington" with their proceeds divided so that Huntington would receive 70% and Mrs. Jones 30%. At the time of this agreement, the foal had not yet been sold. Moreover, it was a "horse" upon which Huntington clearly claimed a lien. This appeared from Zienelle's specific inclusion through the supplemental letter agreement in the list of horses the agreement covered. It further appeared from the Walkers' security agreement with Huntington, which granted a security interest in favor of Huntington in "[a]11 of Debtor's interest and rights in all horses and/or livestock and progeny thereof now owned or hereafter acquired by Debtor; which shall include without limitation the following horses ... Zienelle." As the progeny of Zienelle, the foal, by the unambiguous terms of the agreement, was one of the horses whose sale proceeds were to be divided between Huntington and Mrs. Jones in the 70/30 ratio.
 
 III
 
 23
 Mrs. Jones' arguments against this plain meaning interpretation could be thought to involve two alternative positions: that the agreement is unambiguous, but unambiguously does not include the foal in its coverage; or that it is sufficiently ambiguous (latently?) that parol evidence is admissible to aid its interpretation, and that when the extrinsic evidence before the court is properly considered, it demonstrates an intent not to include the foal.
 
 
 24
 We disagree with both positions.
 
 
 25
 The contention that the phrase "sold by Huntington" was intended to limit the horses covered by the agreement requires a wholly implausible interpretation of its meaning in context. The agreement's intended coverage obviously is defined in its first two clauses, which identify the horses covered by two criteria: "not yet sold", and "upon which Huntington claims a lien." The following phrase, "sold by Huntington" has shifted from a description of coverage to a specification of the sale process. The identity of the seller obviously bears no relationship to coverage concerns. Furthermore, as the district court suggested, to find coverage limited by the identity of the particular seller of specific horses would impose a random quality on the agreement's coverage that could not have been intended. The phrase obviously was intended only to recognize that Huntington, as lien claimant, would be assumed responsible for seeing to specific sales-by Savin and others, including its agents.
 
 
 26
 The contention that the order allowing Savin to sell the foal provided that any excess should be divided "jointly" manifests an intention that these proceeds should not be divided 70/30 is similarly unpersuasive. This evidence could only have the effect urged by Mrs. Jones if, in the first place, there were sufficient ambiguity in the compromise agreement to permit its consideration as extrinsic evidence of intention, and then only if its use resolved the ambiguity in Mrs. Jones' favor. As earlier indicated, we think the agreement is not ambiguous, hence that the parol evidence rule would not permit consideration of this evidence as an interpretive aid. Even assuming, however, that evidence of the order's use of "jointly", and failure to provide a 70/30 split, were admissible, we do not think it would compel Mrs. Jones' interpretation.
 
 
 27
 The order was drafted by Savin's attorney before the compromise agreement was approved. Its obvious concern was only with allowing the sale to proceed in order for Savin to realize his stud fee. The exact division of any excess-and none was then actually expected-was not then a primary or even relevant consideration for the directly interested parties.
 
 IV
 
 28
 For the reasons given, we conclude, with the bankruptcy and district courts, that the compromise agreement covered the foal and therefore dictated the division of the net proceeds of its sale. Accordingly, we affirm the judgment of the district court.
 
 SO ORDERED