PROVIDENCE SQUARE
ASSOCIATES, L.L.C.,
Plaintiff–Appellee,

and

Boney Wilson & Sons, Incorporated; Hannaford Bros. Co., Defendants–Appellees,

v.

G.D.F., INCORPORATED, t/a Rite Aid, Defendant–Appellant.

Providence Square Associates, L.L.C., Plaintiff–Appellant,

v.

Boney Wilson & Sons, Incorporated; Hannaford Bros. Co.; G.D.F., Incorporated, t/a Rite Aid, Defendants–Appellees.

Nos. 99–1246, 99–1346.

United States Court of Appeals,
Fourth Circuit.

Argued: Feb. 28, 2000.

Decided: May 3, 2000.

ARGUED: James Edward Moore, Christian & Barton, Richmond, Virginia, for Appellant. Christian Lee Connell, Mays & Valentine, L.L.P., Virginia Beach, Virginia, for Appellees. ON BRIEF: Gregory A. Giordano, Shuttleworth, Ruloff & Giordano, P.C., Virginia Beach, Virginia, for Appellee Providence Square Associates.

Before WILKINS, MICHAEL, and KING, Circuit Judges.

## OPINION

KING, Circuit Judge:

G.D.F., Inc., trading as Rite Aid ("Rite Aid"), leases space from Providence Square Associates ("Providence Square") in the Providence Square Shopping Center ("shopping center") in Virginia Beach, Virginia. Among other things, Rite Aid's lease guarantees Rite Aid the exclusive right to operate a "drug store" and a "photo finishing business" in the shopping center.

The dispute underlying this appeal arose when Hannaford Bros. Co. and its subsidiary Boney Wilson & Sons, Inc. (collectively "Hannaford"), opened a supermarket in the shopping center, into which Hannaford incorporated a full-service pharmacy and photo drop booth. In the suit below, Rite Aid brought claims against both Hannaford and Providence Square, asserting that Hannaford's operation of a pharmacy and a photo drop booth violated the exclusivity provisions in Rite Aid's lease with Providence Square. The district court rejected these claims, holding that Hannaford was not violating Rite Aid's exclusivity provisions because Hannaford's "Food and Drug Superstore" was neither a "drug store" nor a "photo finishing business." Finding no breach of Rite Aid's lease, the district court entered summary judgment against Rite Aid. *See Providence Square Assocs., L.L.C. v. Boney Wilson & Sons, Inc.,* 34 F.Supp.2d 1030, 1037 (E.D.Va. 1999).

Rite Aid has appealed the district court's judgment. For the reasons set forth below, we reverse.

## I.

### A.

Rite Aid is the successor in interest to a lease originally signed by Drug Fair of Virginia, Inc. ("Drug Fair"). On August 6, 1977, Drug Fair signed a lease ("Rite Aid lease") with Providence Square for approximately 15,500 square feet of space in the shopping center. As an anchor tenant in the shopping center, Drug Fair was able to negotiate several exclusive rights clauses from which Rite Aid now benefits. For example, the Rite Aid lease provides, in pertinent part:

> *Lessor covenants that,* while this lease or any extension or renewal thereof, is in force and effect, *it will not lease for or permit the conducting of any other drug store, variety store or photo finishing business* or any stores whose primary business is the sale of patent medicines, health and beauty aids, cosmetics, lawn and garden and/or outdoor living merchandise (this does not exclude a Home Center/Hardware type of operation) *in the shopping center* or building or site of which the leased premises are a part, nor upon any real estate within a radius of one mile from said shopping center. . . .

J.A. 201 (emphasis added) (hereinafter the "exclusivity provisions").[1]

The Rite Aid lease also contemplates that a "Safeway or another National Chain Food Market" ("supermarket") would lease space in the shopping center, J.A. 172, and the lease makes certain exceptions to the exclusivity provisions for that supermarket. In that regard, the exclusivity provisions do "not apply to any listed items[2] sold by the National Food Chain located in the shopping center, their assigns or sub-lessees or any tenant of that space occupied or formerly occupied by the National Food Chain Store." J.A. 202.

Safeway began leasing space in the shopping center on February 1, 1978. Significantly, Safeway's lease specifically re-

---

**1.** The Rite Aid lease provides that if the exclusivity provisions are breached, Rite Aid is entitled to:

pay as revised rent for said premises a sum equivalent to one and three-fourths percent (1-3/4%) of gross sales with a guaranteed minimum rental of Twenty–Five Thousand Dollars ($25,000.00) annually. Said minimum revised rental shall be paid in monthly installments of Two Thousand Eighty–Three and 33/100 Dollars ($2,083.33) in advance of the first day of each month during the balance of the term hereof.

J.A. 202.

**2.** In the same numbered paragraph, the lease specifies the "listed items": "patent medicines, health and beauty aids, cosmetics, lawn and garden and/or outdoor living merchandise." J.A. 201–02. Hannaford asserts that a "drug store, variety store or photo finishing business" are also to be included in the "listed items"; however, this assertion fails because, in context, it is plain that those businesses are not "items" in the mold of the other listed products.

quired that Providence Square lease space in the shopping center to a "Drug Store," separate and distinct from the supermarket, for twenty years—the same term as Safeway's lease. J.A. 151. Thereafter, Safeway and its successors operated a supermarket, without a pharmacy, in the shopping center for approximately eighteen years.

In 1996, Hannaford, through its representative, Boney Wilson, began negotiating for the space formerly occupied by Safeway. In the course of negotiating Hannaford's lease, Boney Wilson offered Providence Square three draft proposals (two draft leases and one letter of intent), each of which prohibited Hannaford from operating a pharmacy. The first draft lease provided (in language virtually identical to the second draft lease) that: "For the purposes hereof, a 'pharmacy' shall mean any store, or department or counter within a store, which sells prescription medicines or drugs or any items requiring the presence of a registered pharmacist." J.A. 458. However, the final draft of the lease, which was ultimately executed by Hannaford and Providence Square, prohibited Hannaford from operating a pharmacy only "[t]o the extent that" the Rite Aid lease prohibited as much. J.A. 218, 250–51.

Following execution of this lease, Hannaford began constructing the supermarket, into which Hannaford incorporated a pharmacy. On April 24, 1998, Rite Aid's lawyer informed Providence Square of rumors that a pharmacy was being constructed in the Hannaford supermarket, and Rite Aid requested that Providence Square take appropriate action. Providence Square reacted to this notice from Rite Aid by attempting to negotiate—to no avail—an indemnification agreement with Hannaford, under which Hannaford would agree to indemnify Providence Square for any costs arising out of the breach of Rite Aid's exclusivity provisions.

The Hannaford supermarket opened on June 6, 1998. The store houses both a full-service pharmacy and a drop-box for photo processing, and Hannaford's signs and advertisements identify it as a "Food and Drug Superstore." Four months after its opening, prescription drug sales at Hannaford averaged between $30,000 and $32,000 per month, which represented approximately 2.3% of Hannaford's overall sales. By comparison, Rite Aid's pharmacy sales during the same period averaged $55,000 per month, a figure that declined in the face of competition following the opening of Hannaford's pharmacy.

### B.

Following Providence Square's failure to obtain an indemnification agreement from Hannaford, Providence Square filed suit in Virginia state court seeking a declaratory judgment clarifying the rights and obligations of the parties under the applicable leases. In that suit, Providence Square alleged that its leases were being breached because: (1) Hannaford is operating a pharmacy and (2) Rite Aid is withholding rent (*see supra* note 1). Following the removal of the case to the Eastern District of Virginia, Rite Aid filed (1) a counterclaim against Providence Square, alleging that Providence Square allowed Hannaford to operate a pharmacy and a photo drop box in violation of Rite Aid's lease; and (2) a cross-claim against Hannaford, alleging that Hannaford breached its lease with Providence Square, violated the restrictive covenant in Rite Aid's lease, and tortiously induced Providence Square to breach its lease with Rite Aid.

After the parties submitted briefs on various cross-motions for summary judgment, the district court held that Hannaford's operation of a pharmacy and a photo drop box did not violate the exclusivity provisions of Rite Aid's lease. Based on this holding, the district court, on January 26, 1999, granted summary judgment against Rite Aid. Rite Aid has appealed, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

### A.

"We review the district court's grant of summary judgment de novo, viewing all facts and inferences in the light most favorable" to Rite Aid. *Food Lion, Inc. v. S.L. Nusbaum Ins. Agency, Inc.*, 202 F.3d 223, 227 (4th Cir.2000). In this review, we remain mindful that "[s]ummary judgment is appropriate where there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law." *Semple v. City of Moundsville*, 195 F.3d 708, 712 (4th Cir.1999) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

### B.

#### 1.

We are first charged, in this appeal, with resolving whether Hannaford's operation of a pharmacy violates the provisions of Rite Aid's lease prohibiting the operation of another "drug store" in the shopping center. Hannaford contends, in an argument adopted by the district court, that there is no violation of Rite Aid's exclusivity provisions because they prohibit only the operation of another "drug store" in the shopping center, and Hannaford is not a "drug store." Instead, Hannaford asserts that it is a "supermarket," which is not prohibited under Rite Aid's exclusivity provisions. At its base, Hannaford's argument is that a "drug store" or pharmacy, if incorporated into a supermarket, is no longer a "drug store" within the meaning of Rite Aid's lease.

■ Inasmuch as the exclusivity provisions of Rite Aid's lease constitute restrictive covenants, we are guided by Virginia law relating to restrictive covenants.[3] In Virginia, "[c]ovenants, express or implied, restricting the free use of land are not favored and must be strictly construed." *Mid–State Equip. Co. v. Bell*, 217 Va. 133, 225 S.E.2d 877, 884 (1976). In fact, "substantial doubts or ambiguity" about the meaning of a restrictive covenant must be resolved in favor of the unrestricted use of land. *Woodward v. Morgan*, 252 Va. 135, 475 S.E.2d 808, 810 (1996). However, Virginia will enforce "such covenants when applicable, but the person claiming the benefit of the restrictions must prove that the covenants are applicable to the acts of which he complains." *Sloan v. Johnson*, 254 Va. 271, 491 S.E.2d 725, 727 (Va.1997). In our analysis, we also are guided by Virginia principles of contract interpretation, under which we seek to determine the intent of the parties from the language expressed in the contract. *Langley v. Johnson*, 27 Va. App. 365, 499 S.E.2d 15, 16 (1998). If the terms of the contract are clear and unambiguous, then we must afford those terms their plain and ordinary meaning; however, if the terms are vague or ambiguous, then we may consider extrinsic evidence to interpret those provisions. *Shoup v. Shoup*, 31 Va.App. 621, 525 S.E.2d 61, 63–64 (2000).

■ Applying these principles to the case before us, we conclude that the district court erred in its determination that Hannaford's pharmacy is not a "drug store." Indeed, given that Hannaford's signs and advertisements trumpet it as a "Food and Drug Superstore," we might easily resolve this question by merely taking Hannaford at its word. However, reading Rite Aid's exclusivity provisions in context makes clear that the supermarket could not sell prescription pharmaceuticals without violating Rite Aid's restrictive covenant. That is, although the exclusivity provisions prohibit the operation of a "drug store," the provisions also stipulate that the supermarket *may, without* violat-

---

**3.** In this appeal, we are sitting in diversity; therefore, our task "is to 'rule upon [Virginia] state law as it exists and not to surmise or suggest its expansion.'" *Harbor Court As-* *socs. v. Leo A. Daly Co.*, 179 F.3d 147, 153 (4th Cir.1999) (quoting *Burris Chemical, Inc. v. USX Corp.*, 10 F.3d 243, 247 (4th Cir. 1993)).

ing the non-competition clause, sell several items that were otherwise prohibited under the exclusivity provisions, including (nonprescription) patent medicines, health and beauty aids, cosmetics, lawn and garden/and or outdoor living merchandise (collectively the "listed items"). J.A. 201–02. That the leases's "listed items" specifically *exclude* prescription medicine makes clear that the supermarket in the shopping center may not sell prescription medicines. In other words, when the exclusivity provisions are viewed in context, it is clear that Rite Aid's prohibition of another "drug store" sought to avoid the competitive sale of prescription medicine in the shopping center.

Our conclusion is buttressed by the decision of the Supreme Court of Appeals of Virginia in *Krikorian v. Dailey*, 171 Va. 16, 197 S.E. 442, 446 (1938), a case enforcing a restrictive covenant under similar circumstances. In *Krikorian*, a tenant operating a "confectionery" negotiated a restrictive covenant in his lease prohibiting his landlord from leasing an adjacent property "for a confectionery during this lease." *Id.* at 444. When it appeared that the adjacent site would be occupied by a drug store that sold confectionery goods, the tenant sued to enforce the restrictive covenant. At trial, the court instructed the jury that the restrictive covenant was breached if the drug store was "a business substantially similar" to a confectionery. *Id.* at 447. The jury found that the covenant was breached, and the

highest state court in Virginia upheld both the jury's determination and the jury instruction: "All of these rules [of contract construction] are to be remembered, and the academic definition of words is often important, but more important still is the purpose of the covenant. Has that purpose been kept or broken?" *Id.* at 446. The court then explained:

> The courts should and do look to the substance of things in the construction of contracts. If a landlord owned two storerooms in a building and were to rent one to be used as a delicatessen shop and covenanted that no other delicatessen store was to be established in that building, plainly to permit the establishment of another store, designated by its proprietor as a "Food Shoppe," which carried the same merchandise carried by the delicatessen store, would be a violation of this covenant. Nor would the situation change if in addition other things were sold there.

*Id.* at 446.

We believe that this common sense approach is apposite, and we follow it here. The clear lesson of *Krikorian* is that we should look to the substance—not the label—of the activity sought to be restricted under a covenant. Under this guidance, we are compelled to hold that the sale of prescription drugs by Hannaford breaches Rite Aid's exclusivity provisions. A "drug store" is no less a drug store merely because it has been incorporated into a structure called a "supermarket."[4]

---

4. There is, of course, authority in which courts have held various restrictive covenants to be inapplicable, and Hannaford has cited several such cases as authority here. We find none of those cases persuasive. For example, Hannaford has relied upon *Marriott Corp. v. Combined Properties L.P.*, 239 Va. 506, 391 S.E.2d 313, 314 (1990). There, the Supreme Court of Virginia upheld a trial court's determination, following a bench trial, that a lease provision prohibiting the operation of a "drive-in food establishment" in a "described area" did not prohibit the operation of a McDonald's "fast-food" restaurant in that "area." *Id.* In that case, however, the Supreme Court undertook the same analysis

adopted here: it compared the substance of that which was sought to be prohibited—operation of a "drive-in food establishment"—with the substance of the activity sought to be conducted—operation of a "fast-food" restaurant and concluded that the two were not coextensive. Further, the appeal in that case followed trial; therefore, the court was bound to view the facts in the light most favorable to the "fast-food" restaurant, which had prevailed at trial. *Id.* at 315. In this case, by contrast, we are compelled to view the facts in the light most favorable to Rite Aid, and we have concluded that the scope of the activity sought to be avoided—operation of a "drug store"—is coextensive with the

## 2.

The district court reached a contrary conclusion, and we briefly address some of the points upon which the district court relied. First, the district court noted that the sale of prescription drugs only constituted 2.3% of Hannaford's sales. Because, the district court concluded, the sale of prescription drugs is "an incidental" rather than primary source of sales, Hannaford is not a "drug store."

We conclude that the 2.3% figure is, in the context of the issues here, simply a red herring. In fact, the relevant figure is $30,000—representing the average prescription drug sales per month at Hannaford. When this figure is compared with Rite Aid's prescription drug sales of $50,000 per month, there is no doubt that Hannaford's sales qualified that pharmacy as exactly the form of competition that Rite Aid sought to avoid in its lease.

▄ In a similar vein, the district court relied upon Virginia's Sunday closure laws ("Blue Laws") for a definition of "drug store." Under the Blue Laws, a "drug store" was defined as a store where " 'a majority of the sales receipts . . . consist[ ] of prescription and nonprescription drugs, health and beauty aids.' " *Providence Square*, 34 F.Supp.2d at 1035 (quoting Va. Code Ann. § 18.2–341(17) (Michie 1975)). Because, the district court noted, only 2.3% of Hannaford's sales come from these sources, Hannaford does not fit the Blue Laws' definition of a "drug store." On this point, we conclude that the district court's reliance on the Blue Laws was misplaced. First, there is no indication that the parties relied upon the Blue Laws when they drafted the lease, and the Blue Laws thus provide little evidence of the intent of the parties who drafted the relevant provi-

sions. Second, the purpose of Blue Laws "are to provide a day of rest for persons and to prevent physical and moral debasement from uninterrupted labor." *Bonnie Belo Enterprises, Inc. v. Commonwealth*, 217 Va. 84, 225 S.E.2d 395, 397 (1976). As such, those laws are drafted to permit as few businesses as possible from operating, and the category of businesses exempt from the Blue Laws is thus narrowly drawn. Put simply, the Blue Laws contained a definition of "drug store" that is unduly restrictive and inapplicable outside the Blue Laws, and that definition should not control or even inform the interpretation of Rite Aid's lease.[5]

The district court also applied a canon of construction: *expressio unius est exclusio alterius* ("expression of one thing is the exclusion of another") to the exclusivity provisions in order to reach its conclusion. The district court noted that the lease's "listed items" specified goods that could not be the primary business of a store in the shopping center, and the fact that prescription drugs were excluded from the "listed items" evidenced, for the district court, an intent not to prohibit the sale of prescription drugs. On the contrary, as we have noted, the exclusion of prescription drugs from the "listed items" actually bolsters Rite Aid's argument that the supermarket was not to be permitted to sell prescription medicine. *See supra* at 8. Further, to the extent that we are to rely upon any principle of contract construction, we believe that the more applicable principle is that "the construction [of a contract] adopted should be reasonable, and absurd results are to be avoided." *Transit Cas. Co. v. Hartman's, Inc.*, 218 Va. 703, 239 S.E.2d 894, 896 (1978). Were we to adopt Hannaford's construction of the Rite Aid lease, then as long as Hanna-

activity sought to be conducted—operation of a pharmacy.

**5.** In fact, there are other statutes in Virginia that define the word "pharmacy" using the word "drugstore" as a synonym. *See, e.g.,* Va.Code § 54.1–3300 (Michie 1999) (part of

the regulatory scheme for pharmacists and pharmacies). Similarly, Webster's defines "drugstore" as "[a] store where prescriptions are filled and drugs and sundries are sold." *See* Webster's II New Riverside University Dictionary at 407 (1984).

ford's prescription drug sales constituted less than 50% of its overall sales (no matter how large the volume), Hannaford would not be a "drug store" and it would be permitted to sell prescription drugs. Similarly, under Hannaford's reasoning, it might well avoid qualifying as a "drug store" because it calls itself a "Drug *Super*store." J.A. 554–61 (emphasis added). An approach that so permits the label to control substance could surely lead to such absurd results, and we thus cannot adopt Hannaford's reading of the lease.

The restrictive covenant at issue in this case was negotiated between two commercially savvy corporations, and it must be read to have some meaning. Thus, while we are to strictly construe restrictive provisions, we conclude that a proper reading of this lease prohibits Hannaford's sale of prescription drugs. We therefore reverse the district court's summary judgment against Rite Aid, and we thereby reinstate Rite Aid's claims, arising out of this issue, against both Hannaford and Providence Square.

### C.

■ We also briefly address Rite Aid's other claims that were dismissed through the district court's entry of summary judgment. First, Rite Aid's claims below alleged that Hannaford's operation of a photo drop box also violates the exclusivity provisions; however, the district court dismissed this claim on the same reasoning it applied to the "drug store" issue. At oral argument, Hannaford's counsel contended that there was no distinction between Hannaford's operation of a "drug store" and Hannaford's operation of a photo drop box, effectively conceding that an adverse ruling with respect to the "drug store" issue also mandates reversal on the photo drop box issue. We agree with Hannaford on this point; we conclude that the evidence submitted in the district court also mandates reversal of the summary judgment entered with respect to Hannaford's operation of a photo drop box. Accordingly, we

reinstate Rite Aid's claims against both Hannaford and Providence Square arising out of this issue.

■ Rite Aid also has stated a claim against Hannaford for tortious interference with contract. To establish liability under such a claim, Rite Aid must prove that: (1) a valid contract exists or existed; (2) the interferor knew of the contract; (3) the interferor intentionally interfered, inducing or causing a breach of the contract; and (4) the party who has been disrupted suffered damage. *Duggin v. Adams*, 234 Va. 221, 360 S.E.2d 832, 835 (1987). We also conclude that, in these circumstances, there is sufficient evidence for Rite Aid to proceed on this claim, and we thus reverse the district court's entry of summary judgment.

### III.

Because the district court erred in granting summary judgment against Rite Aid, we reverse its judgment and remand this case for further proceedings consistent with this opinion.

*REVERSED AND REMANDED*

