**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 05-2395**

_____

KURT RAHRIG,

Plaintiff - Appellant,

versus

ALCATEL USA MARKETING, INCORPORATED,

Defendant - Appellee,

and

ALCATEL USA, INCORPORATED; NEWBRIDGE NETWORKS,
INCORPORATED; ALCATEL NETWORKS CORPORATION;
ALCATEL GOVERNMENT SOLUTIONS, INCORPORATED;
ALCATEL DATA NETWORKS; ALCATEL CARRIER DATA
DIVISION; CARRIER INTERNETWORKING DIVISION;
ALCATEL, a Republic of France corporation;
ALCATEL USA, CORPORATION,

Defendants.

_____

Appeal from the United States District Court for the Eastern
District of Virginia, at Alexandria.  Gerald Bruce Lee, District
Judge.  (CA-04-1545-1)

_____

Argued:  September 20, 2006      Decided:  December 18, 2006

_____

Before MICHAEL, Circuit Judge, N. Carlton TILLEY, Jr., United
States District Judge for the Middle District of North Carolina,
sitting by designation, and Thomas E. JOHNSTON, United States
District Judge for the Southern District of West Virginia, sitting
by designation.

Affirmed by unpublished opinion.  Judge Johnston wrote the opinion, in which Judge Michael and Judge Tilley joined.

---

**ARGUED:** Jay Joseph Levit, Glen Allen, Virginia, for Appellant.  M. Roy Goldberg, SHEPPARD, MULLIN, RICHTER & HAMPTON, L.L.P., Washington, D.C., for Appellee.  **ON BRIEF:**  Christopher M. Loveland, SHEPPARD, MULLIN, RICHTER & HAMPTON, L.L.P., Washington, D.C., for Appellee.

---

Unpublished opinions are not binding precedent in this circuit.

JOHNSTON, District Judge:

Appellant Kurt Rahrig filed the instant case in November 2004 in the Circuit Court of Fairfax County, Virginia. Appellee Alcatel USA Marketing, Inc. ("Alcatel") removed the case to the United States District Court for the Eastern District of Virginia on December 23, 2004. Mr. Rahrig thereafter filed a seven-count amended complaint on February 4, 2005. The district court dismissed five of the amended complaint's seven counts on April 15, 2005. By order dated November 9, 2005, the district court granted Alcatel's motion for summary judgment and entered judgment against Mr. Rahrig.[1] In this appeal, Mr. Rahrig seeks review of the district court's entry of summary judgment on his breach of contract count. We affirm the district court's finding that Alcatel did not breach its contract with Mr. Rahrig.

I.

The relevant facts in this appeal are undisputed. In 1999, a company later acquired by Alcatel, Newbridge Networks, Inc.,[2] was

---

[1]Following the district court's April 15, 2005 Order, Mr. Rahrig's counts for breach of contract (Count One) and unconscionability (Count Four) remained. It is unclear from the record how Mr. Rahrig's unconscionability claim was resolved, but he does not address this claim on appeal.

[2]In this opinion, we refer only to Newbridge Network, Inc.'s successor, Alcatel.

a data networking manufacturer which designed and developed data networking products for high speed connectivity to the internet.

In July 1999, Alcatel hired Mr. Rahrig as a regional salesperson for the northwestern United States. In connection with his hiring, Alcatel required Mr. Rahrig to sign a contract titled "U.S. Sales Compensation Plan Fiscal Year 2000" (hereinafter "the Plan"), which dictated certain terms of his employment. (J.A. 106.) Pursuant to the Plan, Mr. Rahrig was to be paid a $75,000 base salary, plus commissions for sales which exceeded his annual sales quota. Mr. Rahrig's sales quota for Alcatel's 2000 fiscal year was $2.925 million.

During the 2000 fiscal year, Alcatel made approximately $125 million in sales to New Edge Networks ("New Edge"), an internet supply company. Mr. Rahrig was given "sales credit" for those sales. (J.A. 126-27.) Rather than pay Mr. Rahrig commissions for the full $125 million in sales above his $2.925 million quota, Alcatel reduced his commissions by raising his quota. The sales quota adjustment term of the Plan provided, in relevant part, that:

> Incentive compensation is designed to reward individual effort and performance. This plan is designed to reward outstanding individual contributions. At the same time, it must be consistent with the company's obligations to its shareholders to control expenses, maximize profitability, invest in research and development and make capital expenditures in order to remain competitive in the future. It must also address the Company's need to motivate all employees. . . . [T]his Plan must also ensure that sales credit incentive payments are not disproportionately large so as to unreasonably impair corporate profit.

4

. . .

> In the event that a windfall situation occurs in which effort expended or involvement of the sales representative is not proportional to revenue that would be derived at current quota or commission rates from an exceptionally large opportunity relative to quota, regional management reserves the right to adjust quota, or sales credit allocation for that transaction and thereafter.

(J.A. 110.) (hereinafter "the Windfall Clause.")

The Plan also provided that "on 30 days notice, [Alcatel may] . . . adjust and modify this Plan, including <u>individual [sales] quotas</u> . . . as it deems necessary or appropriate." (J.A. 106.)(emphasis added)(hereinafter "the 30 Days Notice Provision.")

By letter dated November 22, 1999, Alcatel notified Mr. Rahrig that:

> [T]he sales credit that you derived from sales to New Edge Networks is deemed a windfall as defined [by the Plan]. Accordingly, we intend to exercise the Company's right to adjust your quota for the current fiscal year. In order to arrive at a sound business decision on this quota adjustment, we also need to consider your forecast of another large transaction for this customer. Consequently, the setting of your new quota will not happen immediately and will require some further management action in the near term.

> Nevertheless, we want to recognize your substantial success from last quarter promptly. Therefore, [Alcatel] will make a substantial commission payment to you in the gross amount of $200,000.00 USD on the commission run due 11/26/99 (or as soon thereafter as possible), provided you agree to the following terms. This payment will be a sales credit payment as defined by and subject to all terms and conditions in the [Plan]. Any additional payments or necessary adjustments will be made after a new quota is negotiated and agreed upon.

(J.A. 126.) (hereinafter "the November Letter.") Mr. Rahrig signed and "accepted" the November Letter and was thereafter paid $200,000. Id.

On February 28, 2000, Alcatel sent Mr. Rahrig a second letter stating that:

> [T]he sales credit that you derived this quarter is primarily from sales to New Edge Networks and is deemed a windfall as defined by [the Plan]. Accordingly, the Company intends to exercise its right to adjust your quota for the current fiscal year. To appropriately reflect the sales opportunity in your territory, your Fiscal Year 2000 quota will be adjusted to $44,093,333.00 USD, as provided by the Plan.
>
> Nevertheless, in recognition of your efforts and success in the last quarter, the Company, in accordance with the windfall provision, will make a substantial commission payment to you in the gross amount of $200,000.00 USD on the commission run due March 3, 2000 (or as soon as thereafter as possible), provided you agree to the terms in this letter. This payment will be a sales credit payment as defined by and subject to all the terms and conditions in the [Plan].

(J.A. 127.) (hereinafter "the February Letter.") Mr. Rahrig also signed and "accepted" the February Letter and was thereafter paid an additional $200,000. Id.

Mr. Rahrig did not contest Alcatel's application of the Windfall Clause to his sales quota after receiving either the November or February Letters. Mr. Rahrig voluntarily left Alcatel in January 2003. He now seeks recovery of all "unpaid earned sales commissions" due under the Plan. (J.A. 20.)

During discovery, Edward Mamon, an Alcatel employee during the relevant period in this action, testified that he "believed" there

6

was an unpublished "cap" on sales commissions "somewhere around $500,000." (J.A. 676, 701, 703.) Mr. Mamon's belief was based on "the [Alcatel] rumor mill." (J.A. 701.)

Mr. Rahrig testified that although he was aware of the Windfall Clause, Alcatel told him "[t]hat there were no ceilings" on compensation. (J.A. 390.) Thus, when Mr. Rahrig accepted the November and February Letters, he had no knowledge that Alcatel was "attempt[ing] to match up [his commissions] with the targeted and predetermined unpublished ceiling of $500,000." (J.A. 1068.)

II.

"We review the district court's grant of summary judgment <u>de novo</u>, applying the same legal standards as the district court and reviewing the facts and inferences drawn from the facts in the light most favorable to . . . the nonmoving party." <u>Evans v. Techns. Applications & Serv. Co.</u>, 80 F.3d 954, 958 (4th Cir. 1996). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).

"In deciding whether there is a genuine issue of material fact, the evidence of the nonmoving party is to be believed and all

7

justifiable inferences must be drawn in its favor." Am. Legion Post v. City of Durham, 239 F.3d 601, 605 (4th Cir. 2001). A mere scintilla of proof, however, will not suffice to prevent summary judgment; the question is "not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party" resisting summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251 (1986). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celetex Corp., 477 U.S. at 323.

The moving party bears the burden to show that there is no genuine issue of material fact, and the court "must assess the evidence as forecast in the documentary materials . . . in the light most favorable to the party opposing the motion." Charbonnages de Fr. v. Smith, 597 F.2d 406, 414 (4th Cir. 1979).

III.

In this appeal, Mr. Rahrig contends that Alcatel violated the terms of the Plan by (1) adjusting his sales quota prior to 30 days notice and (2) using a cap to limit his commissions.

a.

As noted above, the Plan required "30 days notice" prior to Alcatel's adjustment or modification of "individual [sales] quotas." (J.A. 106.) Mr. Rahrig argues that Alcatel violated the

8

Plan in failing to give him 30 days notice prior to exercising the Windfall Clause. That is, Mr. Rahrig contends the 30 Days Notice Provision prohibited Alcatel from adjusting his individual sales quota until 30 days after his receipt of the November Letter, i.e., December 22, 1999.[3]

The district court rejected this argument, finding that Alcatel's exercise of the Windfall Clause was simply an execution of a term of the agreement and not an "adjustment or modification of the entire [Plan]." (J.A. 1191.) Thus, the district court held that the 30 Day Notice Provision did not apply to Alcatel's use of the Windfall Clause for the New Edge sales.

This Court notes that Mr. Rahrig has not appealed the district court's finding that Alcatel "properly applied the Windfall Clause on a retroactive basis." (J.A. 1190.) The district court based its finding on the plain language of the Plan, which stated that Alcatel "reserves the right to adjust [individual sales] quota . . . for that transaction and thereafter." (J.A. 1191.) Mr. Rahrig's failure to challenge this finding is dispositive of his argument that Alcatel violated the 30 Day Notice Provision.

The Plan is to be "interpreted accordance with" Virginia law. (J.A. 124.) In Virginia, if "the terms of an agreement are clear and unambiguous, the language used will be taken in its ordinary

---

[3]Mr. Rahrig also contends that his sales commissions would have been much greater if his original sales quota had remained in effect until December 22, 1999.

9

signification, and the plain meaning will be ascribed to it." See Marriott Corp. v. Combined Props. Ltd. P'ship, 391 S.E.2d 313, 316 (Va. 1990). A plain reading of the Plan reveals that Alcatel had the discretion to identify windfall situations that had already occurred, and then retroactively apply the Windfall Clause. Thus, even assuming 30 days notice was required before an adjustment could be made to Mr. Rahrig's individual sales quota, because the adjustment could be applied retroactively, Alcatel's application of the adjustment to sales which occurred prior to December 22, 1999, was proper.

b.

Mr. Rahrig also argues that Alcatel breached the Plan by maintaining a secret, extra-contractual $500,000 cap on sales commissions. Specifically, Mr. Rahrig believes that Alcatel's use of a cap on his commissions violated the Windfall Clause because it failed to consider his "effort expended or involvement" in the New Edge sales. (J.A. 110.)

The district court did not address Mr. Rahrig's argument regarding an alleged cap on sales commissions in its written opinion. During the hearing on Alcatel's motion for summary judgment, however, the district court specifically rejected this argument because: (1) the undisputed evidence showed that Mr. Rahrig received significantly more than $500,000 in commissions

10

from the New Edge sales, and (2) Alcatel nevertheless properly invoked the Windfall Clause according to its terms.

As noted above, Mr. Mamon's testimony about the existence of a $500,000 cap was based only on office rumors. Such testimony is inadmissible hearsay and was properly not considered material evidence to deny Alcatel's motion for summary judgment. Greensboro Prof'l Fire Fighters Ass'n v. City of Greensboro, 64 F.3d 962, 967 (4th Cir. 1995) (proffered evidence of un-attributed rumors is inadmissible hearsay; such evidence is neither admissible at trial nor supportive of an opposition to a motion for summary judgment).

We also note that Mr. Rahrig's fiscal year 2000 commissions greatly exceeded $500,000.[4] Thus, any evidence that Alcatel had an unpublished $500,000 cap on commissions is contradicted by Mr. Rahrig's own testimony.

c.

Finally, Alcatel argues that even assuming it violated the Plan's 30 Day Notice Provision or improperly capped commissions at $500,000, Mr. Rahrig waived his right to additional commissions by "accepting" the November and February Letters. (J.A. 126-27.) Under Virginia law, a waiver "is an intentional relinquishment of a known right." Va. Polytechnic Inst. & State Univ. v. Interactive Return Serv., Inc., 595 S.E.2d 1, 6 (Va. 2004). "Two elements are

_____

[4]According to Mr. Rahrig, he ultimately received "total commissions . . . in FY2000 of $758,810." (J.A. 1043.)

11

necessary to establish waiver: knowledge of the facts basic to the exercise of the right and the intent to relinquish that right." Id. The district court found that "Mr. Rahrig waived his right to challenge the application of the Windfall Clause because he signed the [November and February L]etters, accepted payments tendered in connection therewith, and 'agree[d] to the terms' in each letter." (J.A. 1192.)

We agree with the district court that Mr. Rahrig waived his right to challenge Alcatel's adjustment of his sales quota by executing the November and February Letters. Mr. Rahrig knew his sales commissions would be reduced by executing the November and February Letters, thus waiving his ability to bring his instant claim for breach of contract.

IV.

Accordingly, we affirm the judgment of the district court.

AFFIRMED